**WHEATLAND TUBE COMPANY,**
Plaintiff–Appellant,

v.

**UNITED STATES, Defendant,**

v.

**DONGBU STEEL CO., LTD., Hyundai Pipe Co., Ltd., Seah Steel Corporation, Shinho Steel Co., Ltd., and Union Steel Mfg. Co., Defendants–Appellees.**

No. 98–1102.

United States Court of Appeals, Federal Circuit.

Nov. 23, 1998.

Roger B. Schagrin, Schagrin Associates, of Washington, DC, argued for the plaintiff-appellant. With him on the brief was John C. Steinberger.

Velta A. Melnbrencis, Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, and David M. Cohen, Director, filed an entry of appearance on behalf of the defendant.

Donald B. Cameron, Kaye Scholer Fierman Hays & Handler, LLP, of Washington, DC, argued for the defendants-appellees. With him on the brief were Julie C. Mendoza, R. Will Planert, and John P. Healy.

Charles Owen Verrill, Jr., Wiley, Rein & Fielding, of Washington, DC, filed a brief on behalf of the Amici, Inland Steel Bar Company, et al. With him on the brief was Alan H. Price.

Jeffrey M. Winton, Shearman & Sterling, of Washington, DC, filed a brief on behalf of the Amicus Curiae, Hylsa, S.A. de C.V.

Before MAYER, Chief Judge, PLAGER and CLEVENGER, Circuit Judges.

MAYER, Chief Judge.

Wheatland Tube Company appeals the July 18, 1997, judgment of the Court of International Trade, Court No. 96–04–01078, which affirmed the Department of Commerce's final negative scope determination, *Certain Circular Welded Non–Alloy Steel Pipe and Tube from Brazil, the Republic of Korea, Mexico and Venezuela*, 61 Fed.Reg. 11,608 (Dep't Comm.1996) (*"Final Scope Determination"*). Because this ruling is supported by substantial evidence and is otherwise in accordance with law, we affirm.

*Background*

On September 24, 1991, Wheatland Tube Company ("Wheatland") and other domestic pipe producers filed an antidumping petition covering circular welded non-alloy steel pipe, known as standard pipe, from several countries, including Korea, Mexico, and Brazil. Standard pipe meets the American Society for Testing and Materials (ASTM) A–53 standard and is used for low pressure appli-

cations, such as plumbing. In response, the Department of Commerce ("Commerce") initiated antidumping duty investigations. *See Certain Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico and Venezuela,* 56 Fed.Reg. 52,528 (Dep't Comm.1991) (*"Notice of Initiation "*). It defined the scope of the investigations:

The merchandise subject to these investigations is circular welded non-alloy steel pipes and tubes, of circular cross-section, not more than 406.4 mm (16 inches) in outside diameter, regardless of wall thickness, surface finish (black, galvanized, or painted), or end finish (plain end, bevelled [sic] end, threaded, or threaded and coupled). These pipes and tubes are generally known as standard pipe, though they may also be called structural or mechanical tubing in certain applications. Standard pipes and tubes are intended for the low pressure conveyance of water, steam, natural gas, air, and other liquids and gases in plumbing and heating systems, air conditioning units, automatic sprinkler systems, and other related uses. Standard pipe may also be used for light load-bearing and mechanical applications, such as for fence tubing.

Imports of these products are currently classifiable under the following Harmonized Tariff Schedule (HTS) subheadings: 7306.30.10 and 7306.30.50. Although the HTS subheadings are provided for convenience and customs purposes, our written description of the scope of these investigations is dispositive.

*Id.* at 52,529.

The respondents, foreign pipe producers, requested clarification of the investigations' scope, specifically as it pertains to "triple-certified" standard pipe, which meets the ASTM A–53 standard in addition to others. Commerce also asked the petitioners, domestic pipe producers, whether the scope of the investigations should include dual-certified pipes, i.e., pipes that meet both the ASTM A–53 standard as well as the American Petroleum Institute (API) 5L or other line pipe specifications. Line pipe is more expensive to produce and is used in more demanding applications, such as oil and gas pipelines. In a November 19, 1991, letter, the petitioners responded to Commerce that "[d]ual or triple certified standard pipe should be covered by these investigations only if they enter the United States under one of the tariff numbers listed in section I.D.3 of the petitions" and "[a]ny pipe entered under HS item 7306.10.10 would be line pipe outside the scope of the petitions." Petitioner's March 5, 1992, letter to respondents similarly explains that "[t]he scope, as defined by the petition, the Department and the Commission, clearly excludes ... imports of line pipe entering the United States in Harmonized Tariff System of the United States (HS) category 7306.10." The tariff numbers listed in I.D.3 of the petitions, all of which fall within subheading 7306.30, cover standard pipe and tariff numbers listed under 7306.10 refer to "[l]ine pipe of a kind used for oil or gas pipelines." Harmonized Tariff Schedule of the United States (1996), 7306.10 & 7306.30; *see also Final Scope Determination,* 61 Fed.Reg. at 11,611.

Commerce's final determinations adopt the description of the *Notice of Initiation* with the following caveat:

The scope is not limited to standard pipe and fence tubing, or those types of mechanical and structural pipe that are used in standard pipe applications. All carbon steel pipes and tubes within the physical description outlined above are included within the scope of this investigation, *except line pipe,* oil country tubular goods, boiler tubing, cold-drawn or cold-rolled mechanical tubing, pipe and tube hollows for redraws, finished scaffolding, and finished rigid conduit. *Standard pipe that is dual or triple certified/stenciled that enters the U.S. as line pipe of a kind used for oil or gas pipelines is also not included in this investigation.*[1]

*Certain Circular Welded Non–Alloy Steel Pipe from Brazil,* 57 Fed.Reg. 42,940, 42,941 (Dep't Comm.1992) (final determination of LTFV sales) (emphasis added); *see also Certain Circular Welded Non–Alloy Steel Pipe*

---

1. They also expanded the HTS subheadings under which the products are classified to subheadings 7306.30.10.00, 7306.30.50.25, 7306.30.50.32, 7306.30.50.40, 7306.30.50.55, 7306.30.50.85, and 7306.30.50.90.

*from Korea,* 57 Fed.Reg. 42,942, 42,943 (Dep't Comm.1992) (final determination of LTFV sales). Commerce ultimately published antidumping orders, whose scope mirrors the scope of the final determinations. *See Certain Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea (Korea), Mexico, and Venezuela,* 57 Fed.Reg. 49,453, 49,453 (Dep't Comm.1992) (notice of antidumping orders) (*"Standard Pipe Orders"*).

Six months later, Wheatland and other domestic producers filed petitions with Commerce claiming that exports from Brazil, Korea, and Mexico of API 5L line pipe and dual-certified pipe were circumventing the antidumping duty orders because they were being sold for use in standard pipe applications. Wheatland filed a "minor alterations" anticircumvention petition under 19 U.S.C. § 1677j(c) (1994), stating that it was "requesting a circumvention inquiry and not a scope clarification." The Korean pipe producers argued in response that Wheatland's petition failed to state a claim under section 1677j(c) because it had not alleged that standard pipes had undergone a "minor alteration in form or appearance" before being imported as line or dual-certified pipes because standard and line pipes differ significantly. On June 7, 1993, Commerce "determined that a scope inquiry pursuant to 19 C.F.R. § 353.29(i) *is the appropriate action* to respond to the issues raised by petitioners." (emphasis added). Wheatland proceeded without objecting to Commerce's use of this kind of inquiry, admitting that "the analyses and results under either [the anticircumvention or scope clarification] approach would be the same."

Commerce's preliminary scope determination concluded that the scope description was ambiguous and that line and dual-certified pipe used in standard pipe applications were within the scope of the antidumping order. *See Certain Circular Welded Non–Alloy Steel Pipe from Brazil, the Republic of Korea, Mexico and Venezuela,* 59 Fed.Reg. 1929, 1933 (Dep't Comm.1994) (preliminary affirmative scope determination). After evaluating the comments, however, Commerce's final determination concluded that the orders expressly exclude line and dual-certified pipe that enters the United States as line pipe regardless of actual use. *See Final Scope Determination,* 61 Fed.Reg. at 11,609. Wheatland appealed the *Final Scope Determination* to the United States Court of International Trade arguing that the scope of the antidumping orders include the accused products and that Commerce failed to conduct a minor alterations inquiry pursuant to 19 C.F.R. § 353.29(g) (1996). Initially, the government defended its decision to conduct only a scope inquiry pursuant to 19 C.F.R. § 353.29(i) (1996) because Wheatland did "not argue that the line pipe and dual-certified pipe have been altered in form or appearance in some minor respects" and had "never complained about Commerce's decision" to conduct a scope inquiry. The government later requested a remand, however, to consider the anticircumvention petition and either initiate a minor alterations investigation or file a reasoned explanation for the decision not to initiate one.

The court denied this motion on October 9, 1996, because "Commerce set forth its reason; no objection was made to treating [Wheatland's] request as one for a scope determination; and it would be a waste of time and improper to order a remand until error has been demonstrated." On April 8, 1997, the court ordered Commerce to supplement its brief on its interpretation of 19 U.S.C. § 1677j(c) and address any other legal issue pertaining to circumvention based on minor alterations. Commerce responded that on remand, it would be able to find that the alterations served to circumvent the antidumping orders if "from the standpoint of a practical businessman, [the merchandise] is the same stream of exports for which the order was issued." The court disagreed holding that the "minor alterations provision does not apply to a distinct product that is originally unambiguously outside the scope of the order and is not produced by altering the subject merchandise." It reasoned that "the intent of Congress is clear and the statutory language is unambiguous, applying only to merchandise that has been *'altered in form or appearance in minor respects'* from that which appears to have been originally within the scope of the antidumping order." (emphasis in original). Accordingly, the court denied Commerce's request for a remand. It

also affirmed the *Final Scope Determination* because the *Standard Pipe Orders* clearly exclude line and dual-certified pipe. Wheatland appeals.

## Discussion

■ In reviewing a decision by the Court of International Trade to affirm the agency's final determination, "we 'apply anew' the court's statutorily-mandated standard of review to the administrative review." *Torrington Co. v. United States*, 82 F.3d 1039, 1044 (Fed.Cir.1996) (quoting *PPG Indus., Inc. v. United States*, 978 F.2d 1232, 1236 (Fed.Cir. 1992)). Accordingly, we must affirm Commerce's final determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i) (1994).

■ Substantial evidence supports Commerce's conclusion that the line and dual-certified pipe accused of circumventing the *Standard Pipe Orders* is the same pipe that the orders expressly exclude. *See Standard Pipe Orders*, 57 Fed.Reg. at 49,453. Because the description of the merchandise contained in the initial investigation and the *Orders* is unambiguous, Commerce was not required to examine the physical characteristics of the accused product, the expectations of the ultimate purchasers, the ultimate use of the accused product, or the channels of trade. *See* 19 C.F.R. § 353.29(i)(2).

Wheatland's argument that the *Orders* exclude only line and dual-certified pipe that is actually used as line pipe contradicts the unambiguous language of the *Orders*, which refer to the pipes' principal use at the time of entry instead of actual use. *See Final Scope Determination*, 61 Fed.Reg. at 11,611 ("The phrase 'of a kind used for' is commonly used by Customs to signify the chief, or principal, use of a product and not its actual use."). Wheatland also contradicts its statements during the antidumping investigations that they should cover pipe entering the United States under one of the tariff numbers per-

taining to standard pipe and that pipe entering as line pipe would be outside the scope of the petitions.

The International Trade Commission's (ITC) reliance on these statements in conducting its injury analysis makes Wheatland's new position especially untenable. As a result of Wheatland's representations, the ITC did not "examine the impact of imports of line pipe upon the domestic industry." *Id.* It is possible that the ITC would not have found domestic injury if it had examined line pipe imports. Having argued that the orders should exclude line and dual-certified pipe regardless of actual use in order to obtain the antidumping duty orders, Wheatland cannot now urge a broader interpretation during enforcement of the orders. *Cf. Coleco Indus., Inc. v. United States Int'l Trade Comm'n*, 65 C.C.P.A. 105, 573 F.2d 1247, 1257 (1978) ("A patentee having argued a narrow construction for his claims before the United States Patent and Trademark Office (PTO) should be precluded from arguing a broader construction for the purposes of infringement."). Accordingly, the court was correct to sustain Commerce's scope inquiry under 19 C.F.R. § 353.29(i).

■ Wheatland next argues that Commerce's decision to conduct this section 353.29(i) inquiry instead of one under section 353.29(g), which pertains to allegations of minor alterations, was arbitrary and/or an abuse of its discretion [2] because Commerce failed to provide a reasoned explanation for its decision.

■ Courts look for a reasoned analysis or explanation for an agency's decision as a way to determine whether a particular decision is arbitrary, capricious, or an abuse of discretion. *See, e.g., Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 167–68, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962). An explicit explanation is not necessary, however, where the agency's decisional path is reasonably

---

**2.** The regulations, specifically 19 C.F.R. §§ 353.29(e)–(h), describe four types of scope inquiries corresponding to the four exceptions of 19 U.S.C. §§ 1677j(a)–(d) discussed *infra*. Section 353.29(i) pertains to all other scope determinations. An interested party may petition Commerce to determine whether a particular product

being imported into the United States is within the scope of an outstanding antidumping duty order under section 353.29(b). The decision to initiate a scope inquiry and the type of inquiry to conduct are left to Commerce's discretion. *See* 19 C.F.R. §§ 353.29(b), (g)(2).

discernible. *See Ceramica Regiomontana, S.A. v. United States,* 810 F.2d 1137, 1139 (Fed.Cir.1987) ("A court may 'uphold [an agency's] decision of less than ideal clarity if the agency's path may reasonably be discerned.'" (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974))). In the case before us, the *Final Scope Determination* and the unambiguous language of 19 U.S.C. § 1677j (1994), its legislative history, and the *Standard Pipe Orders* illuminate Commerce's decisional path.

The *Final Scope Determination* shows that Commerce considered Wheatland's request for a minor alterations inquiry, but rejected it as inappropriate or unnecessary under section 353.29(g)(2). *See* 61 Fed.Reg. at 11,609 ("The Department concluded that a scope inquiry pursuant to 19 C.F.R. § 353.29(i) was *the appropriate avenue* for addressing the issues raised by petitioners," namely, that certain exporters "were circumventing the antidumping duty orders on standard pipe" in violation of section 1677j(c) and regulation 353.29(g). (emphasis added)). Although Commerce did not explain directly why a minor alterations inquiry was inappropriate, its decisional path—namely, that minor alteration inquiries are inappropriate where the antidumping order expressly excludes the allegedly altered product—is readily apparent.

■ To conduct a minor alterations inquiry, Commerce would have had to conclude that section 1677j(c) and section 353.29 of the regulations authorize it to interpret the scope of an antidumping order to cover an article that the order expressly and unambiguously excludes from the kind or class of article covered by it. The *Final Scope Determination* shows that Commerce was aware of the limitations on its authority to interpret the scope of an order. *See* 61 Fed.Reg. at 11,-612. Although Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders," it can neither "change them," *Ericsson GE Mobile Communications, Inc. v. United States,* 60 F.3d 778, 782 (Fed.Cir.1995), nor interpret them "in a way contrary to [their] terms," *Smith Corona Corp. v. United States,* 915 F.2d 683, 686 (Fed.Cir.1990). *See also Alsthom Atlantique*

*v. United States,* 787 F.2d 565, 571 (Fed.Cir. 1986) (The International Trade Administration "cannot change the scope of an underlying antidumping determination [to exclude an article] when Treasury has *specifically* included [that] article within the scope of its underlying determination." (emphasis in original)). Congress has provided that Commerce's consideration of certain types of articles within the scope of an order will be a proper clarification or interpretation of the order instead of improper expansion or change even where these products do not fall within the order's literal scope. These articles include: (1) products completed or assembled in the United States whose "parts or components [are] produced in the foreign country with respect to which [an antidumping duty] order ... applies," 19 U.S.C. § 1677j(a); (2) products "completed or assembled in another foreign country from merchandise which ... is subject to [an antidumping duty] order or ... is produced in the foreign country with respect to which [the] order ... applies," *id.* § 1677j(b); (3) products "altered in form or appearance in minor respects ... whether or not included in the same tariff classification," *id.* § 1677j(c); and (4) later-developed products that would have been included in the order, *see id.* § 1677j(d).

Section 1677j(c) reflects Congress' concern that foreign producers were circumventing antidumping duty orders by making minor alterations to products falling within the scope of an order in an effort to take these products outside of the literal scope. *See, e.g.,* S.Rep. No. 100–71, at 101 (1987) ("An important purpose of this provision is to avoid results such as the one reached ... where a minor alteration resulted in portable typewriters with calculator or memory features being excluded from the scope of an existing antidumping order on portable typewriters. The Committee intends this provision to prevent foreign producers from circumventing existing findings or orders through the sale of later-developed products or of products with minor alterations that contain features or technologies not in use in the class or kind of merchandise imported into the United States at the time of the original investigation."); *see also* H.R. 100–

40, at 135 (1987) (The minor alterations provision "might apply when steel sheet is temper rolled prior to importation ... or when a fire resistance coating is applied to cookware prior to importation."). Although the previous statute contained no provision covering altered merchandise, Commerce had "include[d] within the scope of an antidumping ... order ... merchandise which has been altered in minor respects from the merchandise originally investigated." H.R. Conf. Rep. No. 100–576, at 600 (1988), *reprinted in* 1988 U.S.C.C.A.N. 1547, 1633.

█ The statute codified this practice by providing that "[t]he class or kind of merchandise subject to ... an antidumping duty order ... shall include articles altered in form or appearance in minor respects ... whether or not included in the same tariff classification." 19 U.S.C. § 1677j(c)(1). This provision does not apply, however, if Commerce "determines that it would be unnecessary to consider the altered merchandise within the scope of the ... order." *Id.* § 1677j(c)(2); *see also* 19 C.F.R. § 353.29(g). In essence, section 1677j(c) includes within the scope of an antidumping duty order products that are so insignificantly changed from a covered product that they should be considered within the scope of the order even though the alterations remove them from the order's literal scope. *Cf. Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1517–18 (Fed.Cir.1995) (in banc), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997) (An accused product outside the literal language of a patent claim nevertheless infringes when "the differences between the claimed and accused products ... are insubstantial."); *see also* H.R. 100–40, at 135 (1987) (The analysis under the minor alterations provisions determines "whether an alteration results in a change in the class or kind of merchandise, and is therefore no longer a minor alteration."). It does not, however, abrogate the cases prohibiting changing or interpreting orders contrary to their terms.

Applied to the present case, section 1677j(c) requires the scope of the *Standard Pipe Orders* to include the enumerated products plus minor alterations—products that are so insignificantly changed from a covered product that they should be considered with-

in the scope of the order. If these minor alterations include line and dual-certified pipe, then the *Standard Pipe Orders* would read: "All carbon steel pipes and tubes within the physical description outlined above [*plus,* under the minor alterations provision, *line and dual-certified pipe* ] are included within the scope of these orders, *except line pipe ... [and][s]tandard pipe that is dual or triple certified/stenciled ...."* *Standard Pipe Orders,* 57 Fed.Reg. 49,453 (emphasis added). This interpretation renders the orders internally inconsistent because it both excludes and includes the same products— line and dual-certified pipes. A minor alterations inquiry is, therefore, unnecessary because it can lead only to an absurd result.

Viewed against this backdrop, Commerce's decision to conduct a scope inquiry instead of a minor alterations inquiry was not arbitrary. Its analysis that "[i]n light of the language of the scope and the underlying record of the investigations, the Department has concluded that an affirmative scope ruling would be contrary to the scope language as written and would represent an impermiss[i]ble expansion of the scope of the orders," 61 Fed. Reg. at 11,611, demonstrates that it was adopting the only interpretation of the minor alterations provision that avoids conflict with its inability to interpret orders contrary to their terms: Section 1677j(c) does not to apply to products unequivocally excluded from the order in the first place.

Finally, Wheatland argues that this result allows importers to finesse their way through loopholes in antidumping orders, contrary to public policy. We do not consider the unequivocal exclusion of line and dual-certified pipe from the *Standard Pipe Orders* to be a loophole. Rather, Wheatland repeatedly argued for this exclusion with full knowledge that these pipes were capable of standard applications. Allowing Wheatland to retreat from this error would itself frustrate the purpose of the antidumping laws because it would allow Commerce to assess antidumping duties on products intentionally omitted from the ITC's injury investigation. *See* 19 U.S.C. § 1673 (1994) (requiring an injury determination by the ITC before the imposition of antidumping duties).

## Conclusion

Accordingly, the judgment of the Court of International Trade is affirmed.

*AFFIRMED.*