Richard W. Goldberg, Senior Judge *1267 Goldberg, Senior Judge: This action arises from a challenge by plaintiffs, Guizhou Tyre Co., Ltd. and Guizhou Tyre Import and Export Co., Ltd., (collectively, "Guizhou" or "GTC"), consolidated plaintiff Xuzhou Xugong Tyres Co., Ltd., ("Xugong"), and intervenor-plaintiff Tianjin United Tire & Rubber International Co., Ltd. ("TUTRIC") (collectively "Plaintiffs") to certain aspects of the final results published by the Department of Commerce ("the Department" or "Commerce") of the underlying administrative review of the countervailing duty order on off-the-road tires ("OTR tires") from the People's Republic of China ("PRC"). Certain New Pneumatic Off-the-Road Tires from the People's Republic of China , 82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017) (final results), amended by Certain New Pneumatic Off-the-Road Tires from the People's Republic of China, 82 Fed. Reg. 40,554 (Dep't Commerce Aug. 25, 2017) (am. final results) (" Amended Final Results "). Plaintiffs have filed summary judgment motions, Pls'. Mot. for J. on Agency R., ECF No. 63 (Jan. 5, 2018) ("Pls.' Br."), challenging Commerce's Amended Final Results with respect to: (1) Commerce's use of an adverse inference-and subsequent application of an adverse rate-in determining use of the China Export-Import Bank's Export Buyer's Credit program; (2) various aspects of the benchmarks used in calculating the benefits associated with several programs for less than adequate remuneration; and (3) Commerce's decision to countervail the Import Duty Exemption For Imported Raw Materials Program. Xugong filed a separate motion for judgment on the pleadings, Xugong Mot. for J. on Agency R., ECF No. 62 (Jan. 5, 2018) ("Xugong Br."), and TUTRIC has adopted and incorporated the challenges brought by both Guizhou and Xugong, TUTRIC Mot. for J. on Agency R., ECF No. 64 (Jan. 5, 2018).
For the reasons discussed below, the court remands the Department's findings with respect to the adverse inference applied to the Expert Buyer's Credit program, remands and sustains in part the Department's benchmark calculations, and sustains the Department's decision to countervail the Import Duty Exemption for Imported Raw Materials Program.
BACKGROUND
On November 9, 2015, Commerce initiated a review of the countervailing duty order on certain OTR tires from the PRC based upon timely requests from interested parties during the period of review between January 1, 2014 and December 31, 2014. Antidumping and Countervailing Duty Administrative Reviews , 80 Fed. Reg. 69,193 (Dep't Commerce Nov. 9, 2015) (initiation). On February 3, 2016, Commerce selected Guizhou and Xugong as mandatory respondents. Resp't Selection Mem., Joint Appendix, ECF No. 79 ("J.A.") Tab 2 (Jan. 29, 2016). Both parties, as well as the Government of China ("GOC"), responded to the Department's initial and supplemental questionnaires. GOC Initial Questionnaire Resp., J.A. Tab 4 (Apr. 13, 2016) ("GOC Initial Questionnaire Resp."); GTC Initial Questionnaire *1268 Resp., J.A. Tab 5 (Apr. 19, 2016) ("GTC Initial Questionnaire Resp."); GOC New Subsidy Allegations ("NSA") Questionnaire Resp., J.A. Tab 15 (Aug. 19, 2016) ("GOC NSA Questionnaire Resp."); GTC NSA Questionnaire Resp., J.A. Tab 14 (Aug. 19, 2016) ("GTC NSA Questionnaire Resp."); GTC First Supp. Resp., J.A. Tab 13 (Aug. 19, 2016) ("GTC First Supp. Resp.").
On October 14, 2016, Commerce issued its preliminary results from the administrative review based on the parties' questionnaire responses. Certain New Pneumatic Off-the-Road Tires From the People's Republic of China , 81 Fed. Reg. 71,056 (Dep't Commerce Oct. 14, 2016) (prelim. results) (" Preliminary Results ") and accompanying Prelim. Decision Mem., J.A. Tab 25 (Oct. 5, 2016) ("PDM"). In its preliminary findings, the Department determined that (1) the GOC failed to provide answers regarding the China Export-Import Bank Buyer's Credit Program, PDM at 14; (2) Guizhou and Xugong benefited from the provision of certain inputs at less-than-adequate remuneration, using Tier 2 benchmark measurements for carbon black and nylon cord, and Tier 1 benchmark measurements for the import prices of natural and synthetic rubber, id. at 22; and (3) the import duty and value added tax (VAT) exemptions on imports of raw materials were countervailable subsidies, id. at 35. Commerce determined that because the GOC failed to provide responses to a series of questions related to the Export Buyer's Credit Program-countering the GOC's allegation of non-use-the Department was permitted to apply an adverse inference in selecting from the facts otherwise available that Guizhou and Xugong used and benefited from the program. Id. at 38.
The Department's final decision largely echoed its preliminary findings. Certain New Pneumatic Off-the-Road Tires from the People's Republic of China , 82 Fed. Reg. 18,285 (Dep't Commerce Apr. 18, 2017) (final results) (" Final Results ") and accompanying Issues & Decision Mem., J.A. Tab 33 (Apr. 12, 2017) ("I & D Mem."). Commerce continued to include ocean and inland freight delivery charges and added import duty and VAT payments into the benchmark prices, despite Guizhou's position that these duties should not be included because it does not pay import duties or VAT on imported inputs. I & D Mem. at 9. As a result, the Department found a 34.46 percent ad valorem countervailable subsidy rate for Guizhou, and a 46.01 percent subsidy rate for Xugong. Id. Later, the Department issued a memorandum, amending the Final Results to include quarterly synthetic rubber benchmark data, as submitted by petitioners, following the Department's initial error in using figures for natural rubber benchmarks. Ministerial Error Mem., J.A. Tab 38 (Aug. 21, 2017) ("Ministerial Error Mem."). The amended final results were published on August 25, 2017. See generally Amended Final Results .
Plaintiffs' motion for judgment followed, challenging Commerce's Amended Final Results with respect to: (1) Commerce's use of an adverse inference in selecting from among the facts available in determining use of the China Export-Import Bank's Export Buyer's Credit program by both Xugong and Guizhou; (2) Commerce's selection of the adverse rate applied to the Export Buyer's Credit program; (3) various aspects of the benchmarks used in calculating the benefits associated with several programs for less than adequate remuneration, including nylon cord, synthetic rubber, and carbon black; and (4)
*1269 Commerce's decision to countervail the Import Duty Exemption For Imported Raw Materials Program. Pls.' Br. Xugong filed a separate motion for judgment on the pleadings. Xugong Br. For the reasons discussed below, the court sustains in part and remands in part Commerce's Amended Final Results .
JURISDICTION AND STANDARD OF REVIEW
The court exercises jurisdiction to hear this appeal under 28 U.S.C. § 1581(c). The court will sustain Commerce's determination unless the court concludes that the determination is "unsupported by substantial evidence on the record, or otherwise not in accordance with law ...." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence amounts to "more than a mere scintilla" of evidence. Universal Camera Corp. v. N.L.R.B. , 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951). It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Id. In other words, "substantial evidence" "can be translated roughly to mean 'is [the determination] unreasonable?' " Nippon Steel Corp. v. United States , 458 F.3d 1345, 1351 (Fed. Cir. 2006).
DISCUSSION
Plaintiffs raise challenges to the Department's determinations regarding: (1) China's Export-Import Bank Buyer's Credit Program; (2) the Department's calculation of benchmarks measuring adequate remuneration for synthetic rubber, carbon black, and nylon cord; (3) China's VAT and Import Duty Exemption for Imported Raw Materials Program as a countervailing subsidy; and (4) the rate calculations formulated for the VAT aspect of the VAT and Import Duty Exemption for Imported Raw Materials Program. The court sustains Commerce's decision to countervail the VAT and Import Duty Exemption for Imported Raw Materials Program. For the remaining issues raised by plaintiffs, the court remands in part, pursuant to the below.
I. China Export Import Bank Buyer's Credit Program
In its review, Commerce examined whether Plaintiffs potentially benefited from China's Export Buyer's Credit Program (the "Program"), which provides loans to foreign companies to promote the export of Chinese goods. See Antidumping and Countervailing Duty Administrative Reviews , 80 Fed. Reg. 69,193 (Dep't Commerce Nov. 9, 2015) (initiation). Commerce issued two questionnaires to the respondents, both seeking information regarding the Program. Commerce NSA Questionnaire to Xugong, J.A. Tab 9 (July 26, 2016); Commerce NSA Questionnaire to GOC, J.A. Tab 10 (July 26, 2016); Commerce NSA Questionnaire to Guizhou, J.A. Tab 12 (July 26, 2016). Plaintiffs each responded that none of their relevant customers used the Program. GOC NSA Questionnaire Resp. at 22; GTC NSA Questionnaire Resp. at 14. For its part, the GOC declined to provide questionnaire responses concerning the operation of the Program. As a result of the GOC's failure to cooperate, Commerce determined that Xugong and Guizhou benefitted from the Program. I & D Mem. at 23.
Pursuant to 19 U.S.C. § 1677e, the U.S. Department of Commerce ("Commerce") may select from facts otherwise available when a party to a proceeding: (A) withholds information that is requested; (B) fails to provide such information in the *1270 form and manner requested; (C) significantly impedes a proceeding; or (D) provides information which cannot be verified. See 19 U.S.C. § 1677e(a)(2). Further, Commerce may select from the facts available in a manner adverse to the respondent if the gap in the record was caused by the failure of the respondent to cooperate to the best of its ability. 19 U.S.C. § 1677e(b). Compliance with the "best of its ability" standard is determined by assessing whether the respondent puts forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). Therefore, Commerce can apply adverse facts available ("AFA") only when it has first made a supported finding under § 1677e(a) that information is missing from the record for an enumerated reason, followed by a separate finding under § 1677e(b) that there has been a failure to cooperate.
The court finds that Commerce applied AFA without substantial evidence to support the requisite threshold finding that there was a gap in the record warranting the use of facts available. Commerce determined that the GOC failed to comply, to the best of its ability, with Commerce's request for information regarding an amendment to the operation of the Program and thus, the use of an adverse inference was warranted under 19 U.S.C § 1677e(b)(1). Crucially missing from this assessment is an initial finding by Commerce that material information was missing from the record. While the Department did note that information as to the functioning of the Program was missing, this finding was rendered immaterial by responses from both Guizhou and the GOC as to the Program's use. This defect proves fatal to Commerce's imposition of AFA.
Generally, while respondent companies will have "information pertaining to the existence and amount of the benefit conferred by the program," "foreign governments are in the best position to provide information regarding the administration of their alleged subsidy programs." Archer Daniels Midland Co. v. United States , 37 CIT ----, ----, 917 F.Supp.2d 1331, 1342 (2013). When a foreign government fails to respond to the best of its ability, Commerce will typically find that the government provided a financial contribution to a specific industry. Id. When the application of AFA under such circumstances may adversely impact a cooperating party, however, Commerce should seek to avoid such impact if, as is the case here, relevant information exists elsewhere on the record. Id. To apply AFA in circumstances where relevant information exists elsewhere on the record-that is, solely to deter non-cooperation or "simply to punish"-would make the agency's determination based on an incomplete (and therefore, inaccurate) account of the record; that is a fate this court should sidestep. See Changzhou Trina Solar Energy Co. v. United States , 41 CIT ----, ----, 255 F.Supp.3d 1312, 1319 (2017) (sustaining Commerce's decision to refrain from using AFA where information existed elsewhere on the record because to do otherwise would "apply AFA for no reason other than to deter the GOC's non-cooperation in future proceedings ....").
Although GOC failed to fully respond to Commerce's requests for information, this failure did not create the requisite gap needed to make an adverse inference. Regardless of GOC's questionnaire responses to several questions posed by Commerce, *1271 GOC unequivocally stated that the respondents' customers did not use the Export Buyers Credit Program. There is no ambiguity or uncertainty surrounding the use of the Program by Plaintiffs or their customers, as this information consisted of signed declarations from Plaintiffs' U.S. customers certifying non-use, and is corroborated by GOC's statements. See GTC NSA Questionnaire Resp. at 13-14. Therefore, the only gap of information on the record are facts regarding certain aspects of the operation of the Program. In turn, the only factual issues potentially appropriate for facts otherwise available, § 1677e(a), and adverse inferences, § 1677e(b), are those that concern the operation of the Program, factors entirely irrelevant to Guizhou's apparent non-use.
Although Commerce possessed declarations covering Plaintiffs' affiliated and unaffiliated customers in the United States, Commerce declined to consider these declarations, thereby abandoning its long-standing practice. See Certain In-shell Roasted Pistachios from the Islamic Republic of Iran , 73 Fed. Reg. 9993 (Feb. 25, 2008) (final results) and accompanying Issues & Decision Mem. cmt. 2 (explaining that in instances where the foreign government fails to adequately respond to Commerce's questionnaires, Commerce must "calculate[ ] the benefit by relying, to the extent possible, on information supplied by the respondent firm."). Commerce's argument that because it lacked a "complete and verifiable understanding of the program's operation, especially with regard to the involvement of third-party banks, the information provided by [the] respondents is [ ] unverifiable," I & D Mem. at 24, is without merit, because Commerce improperly conflates the program's operation with its use. Plaintiffs have knowledge of their own usage of this program, however it operates, and certified its non-use by its customers. Commerce's obligation when drawing an adverse inference based on a lack of cooperation by a foreign government is to avoid collaterally impacting respondents to the extent practicable by examining the record for replacement information.
In sum, Commerce had a clear path to find non-use by either accepting the declarations submitted by Plaintiffs and their U.S. customers or by verifying these declarations. Instead, Commerce has chosen a more convoluted route in substituting facts derived from the record with its own unsupported conclusions. Such a determination cannot be sustained by the court.
II. The AFA Rate for the Buyer's Credit Program
Having concluded that Commerce inappropriately applied AFA without substantial evidence to support the requisite threshold finding that there was a gap in the record warranting the use of AFA, the Department's application of an adverse countervailing subsidy rate of 10.54 percent ad valorem is rendered moot.[1] In any event, the court notes that the Department *1272 improperly applied its regulatory hierarchy for the selection of rates for the Buyer's Credit Program. As it stands, the Department's explanation of its application of the rate hierarchy is lacking. Commerce has explained its AFA rate selection hierarchy as follows:
Consistent with section 776(d) of the Act and our established practice, we selected the highest calculated rate for the same or similar program as AFA. When selecting rates in an administrative review, we first determine if there is an identical program from any segment of the proceeding and use the highest calculated rate for the identical program (excluding de minimis rates). If no such identical program exists, we then determine if there is a similar/comparable program (based on the treatment of the benefit) within the same proceeding and apply the highest calculated rate for the similar/comparable program, excluding de minimis rates. Where there is no comparable program, we apply the highest calculated rate from any non-company specific program in any CVD case involving the same country, but we do not use a rate from a program if the industry in the proceeding cannot use that program. We are using an AFA rate of 10.54 percent ad valorem , the highest rate determined for a similar program in the Coated Paper from the PRC proceeding, as the rate for these companies.
PDM at 14 (footnotes omitted).
The Government claims that "Commerce determined that there were no calculated rates for the Export Buyer's Credit program in the proceeding-and, thus, no rates were available to Commerce under step one or step two of its review hierarchy." Def.'s Resp. to Pls.' Mot. for J. on Agency R. 30, ECF No. 71 (May 25, 2018) ("Def.'s Br."). However, step two calls upon Commerce to apply the highest calculated rate for a similar program (determined by the type of benefit) from any segment within the same proceeding. I & D Mem. at 14. Commerce apparently did not seek out a rate from a similar program in the same proceeding (as required pursuant to the hierarchy) before moving immediately-and inexplicably-to step three upon determining that there was no rate for the identical program. On remand, Commerce is encouraged to take a closer look at the regulation it depends upon, in order to issue a supported and reasoned determination based on-if necessary-the highest de minimis calculated rate from a similar program in the same proceeding.
III. Calculation of Tier 2 Benchmarks
Plaintiffs raise several challenges to the Department's calculation of benchmarks measuring whether adequate remuneration was paid for synthetic rubber, carbon black, and nylon cord. Specifically, Xugong argues that Commerce's use of quarterly-rather than monthly-data to measure synthetic rubber benchmark prices was in error, Xugong Br. at 10; and Guizhou argues that neither VAT nor ocean freight inputs should have been added to the benchmark calculations, Pls.' Br. at 40. Because Commerce used a Tier 2 benchmark for synthetic rubber and carbon black, the Department's decision to include VAT and import duties in its benchmark analyses-based on quarterly data-was reasonable and supported by substantial evidence. However, the court cannot support *1273 the Department's decision to include ocean freight charges in its Tier 1 benchmark calculation for nylon cord. On remand for further consideration, the court orders Commerce to carefully-and in its totality-review the evidence submitted by the plaintiffs to determine whether Chinese import statistics are already freight inclusive, thereby rendering the inclusion of ocean freight data in its benchmark calculation entirely duplicative.
A. Legal Framework
A countervailable subsidy exists where (1) a financial contribution is provided, (2) a benefit is thus conferred, and (3) the subsidy is specific. See 19 U.S.C. § 1677(5). When a financial contribution is provided through goods or services, the statute defines a benefit as arising where goods or services "are provided for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). The adequacy of remuneration "shall be determined in relation to prevailing market conditions for the good or service being provided" in the country that is subject to review. 19 U.S.C. § 1677(5)(E). Usual market conditions comprise of "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." 19 U.S.C. § 1677(5)(E).
Commerce employs a hierarchical framework to measure the adequacy of remuneration. See 19 C.F.R. § 351.511. First, by use of a "Tier 1" benchmark, Commerce typically compares the price the government sold the goods or service to the respondent with a market-determined price in the country in question. 19 C.F.R. § 351.511(a)(2)(i). In contrast, a "Tier 2" benchmark, employed when market prices are not accessible, allows Commerce to "compar[e] the government price to a world market price where it is reasonable to conclude that such price would be available to purchasers in the country in question." 19 C.F.R. § 351.511 (a)(2)(ii). If a world market price cannot be used, then Commerce will "measure the adequacy of remuneration by assessing whether the government price is consistent with market principles." 19 C.F.R. § 351.511(a)(2)(iii). This is a "Tier 3" benchmark. See Zhaoqing New Zhongya Aluminum Co. v. United States , 37 CIT ----, ----, 929 F.Supp.2d 1324, 1327 (2013) (concluding that Commerce's decision to use Tier 2 "world market" pricing only after determining that Tier 1 pricing is "unusable" is part of a "reasonable benchmark" calculation and "is well grounded in the applicable regulations.").
Here, Commerce used a Tier 2 benchmark. No party disputes that determination. Therefore, Commerce was required to "adopt[ ] the world market price as a benchmark or proxy for the price in the producer's home country," and if the record presented more than one viable world market price, Commerce was required to average the prices as permitted, considering factors such as "price, quality, availability, marketability, transportation, and other conditions of purchase or sale." RZBC Grp. Shareholding Co. v. United States , 39 CIT ----, ----, 100 F.Supp.3d 1288, 1304 (2015) (citing 19 U.S.C. § 1677(5)(E) ).
B. Quarterly Data
Commerce used quarterly Tier 2 benchmark data submitted by petitioners for synthetic rubber in determining Xugong's and Guizhou's subsidy rates. Ministerial Error Mem. at 4. Xugong argues that monthly benchmark data provided by Guizhou is more appropriate. In the Final Results , Commerce also included VAT, import duties, and ocean freight costs in its *1274 Tier 2 benchmark calculations of nylon cord, carbon black, and synthetic rubber. I & D Mem. at 9-15. Xugong argues that Commerce's use of quarterly benchmark data, when alternative monthly data is available, conflicts with Commerce's past practice. Xugong Br. at 10. Nevertheless, Xugong relies on a prior review that explicitly states the opposite. See Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China , 81 Fed. Reg. 46,904 (Dep't Commerce July 19, 2016) (final results) and accompanying Issues & Decision Mem. cmt. 6 ("The factors relied upon by the Department when determining appropriate benchmark(s) for valuing an input depend on the facts surrounding the data/information placed on the record of a proceeding and therefore must be evaluated on a case-by-case basis." (emphasis added) ).
The court's role is not to assess whether the benchmark data Commerce used was the "best available," but rather whether Commerce's choice was reasonable. Peer Bearing Company-Changshan v. United States , 27 CIT 1763, 1770, 298 F.Supp.2d 1328, 1336 (2003). The Department's "reasoned analysis or explanation for [its] decision," then, determines "whether a particular decision is arbitrary, capricious, or an abuse of discretion." Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369 (Fed. Cir. 1998).
As illustrated by the regulatory hierarchy, Commerce prefers to derive a benchmark to measure adequacy of remuneration for an input from "a market-determined price for the good ... resulting from actual transactions in the country in question." 19 C.F.R. § 351.511(a)(2)(i). After a reevaluation of its Preliminary Results , which were based on Tier 1 calculations, Commerce determined that the Chinese synthetic rubber market was distorted, causing the prices from the Chinese market to be unusable. I & D Mem. at 13. As a result, Commerce opted instead to use a Tier 2 benchmark for measuring adequacy of remuneration from the provision of synthetic rubber. Id. at 13.
In selecting the Tier 2 benchmark, Commerce stated that it would use the monthly synthetic rubber prices provided by petitioners from the International Rubber Study Group Statistical Bulletin. Id. In its Final Results , Commerce erroneously used natural rubber benchmark data, which it then remedied in its Amended Final Results . Amended Final Results at 40,555. Commerce clarified that it had intended to use the Tier 2 synthetic rubber benchmark data submitted by petitioners from the International Rubber Study Group Statistical Bulletin. Ministerial Error Mem. at 3-4. The only synthetic rubber benchmark data provided by petitioners on the record are quarterly and annual data.
Xugong argues that Commerce's reliance on quarterly data is distortive. However, this argument is meritless, because no specific support was offered. In contrast, Commerce's decision is supported by a reasonable reading of record evidence. Therefore, this Court will not cast doubt on Commerce's reasonable selection of quarterly benchmark data, even though alternative data sets are available.
C. VAT and Import Duties
Commerce identified and included VAT and import duties in its Tier 2 benchmark analysis of the less-than-adequate remuneration programs for synthetic rubber and carbon black, claiming that such costs *1275 are required adjustments to a Tier 2 benchmark. I & D Mem. at 10. Guizhou argues that Commerce should not include VAT in its calculations because, as Guizhou claims, it did not actually pay VAT upon import. Pls.' Br. at 42. Guizhou continues that because VAT is not expressly enumerated in 19 C.F.R. § 351.511(a)(2)(iv) as a "delivery charge[ ]" or an "import dut[y]," it does not fall within the class of adjustments that Commerce would normally include. Id.
The regulation provides that in measuring adequate remuneration, Commerce must adjust the comparison price to reflect the price that a firm "actually paid or would pay if it imported the product," including "delivery charges and import duties." 19 C.F.R. § 351.511(a)(2)(iv). Although Commerce's regulations direct it to use the "delivered price" when calculating a benchmark price, 19 C.F.R. § 351.511(a)(2)(iv), it is not "plainly erroneous or inconsistent with the regulation" to "permit inclusion of expenses other than delivery charges and import duties in benchmark calculations ...." Changzhou Trina Solar Energy Co. v. United States, 41 CIT ----, ----, 255 F.Supp.3d 1312, 1325 (2017) (citing Decker v. Nw. Envtl. Def. Ctr. , 568 U.S. 597, 613, 133 S.Ct. 1326, 185 L.Ed.2d 447 (2013) ). As this court has previously stated, the regulation's reference to a "firm" "refers to a hypothetical firm located in the PRC" and the fact that Plaintiffs "might not pay the VAT or import duties" is "irrelevant, given that a firm located in the PRC ... would ordinarily have paid these duties." Beijing Tianhai Indus. Co. v. United States , 39 CIT ----, ----, 52 F.Supp.3d 1351, 1374 (2015). Therefore, the inclusion of a VAT in the Department's Tier 2 calculation is reasonable so long as a PRC firm would have ordinarily paid the duties. Moreover, including VAT in benchmark calculations generally falls in line with the court's prior decisions addressing this particular charge. See Juancheng Kangtai Chem. Co. v. United States , Slip Op. 17-3, 2017 WL 218910, at *11 (CIT Jan. 19, 2017) ("Commerce properly interpreted 'other charges imposed' to include 'costs,' and irrecoverable VAT is just such a cost."); Jacobi Carbons AB v. United States , 41 CIT ----, ----, 222 F.Supp.3d 1159, 1188 (2017) ("Accordingly, the Chinese VAT is permissibly construed as an 'other charge' that is 'imposed by [China] upon the exportation of the subject merchandise.' "); Beijing Tianhai Indus. Co. , 39 CIT at ----, 52 F.Supp.3d at 1374 (permitting VAT calculation in a Tier 2 benchmark analysis because "a firm located in the PRC that imported steel tube would ordinarily have paid these duties."). Guizhou's reference to Exhibit II.E.2-the GTC VAT and Import Tariff Exemptions Table for Imported Materials, indicating that the "actual VAT paid" was 0, GTC First Supp. Resp. at 27-is overall immaterial because, as Guizhou states, it demonstrates what GTC did pay, not what a "hypothetical firm" in China would pay.
Guizhou's arguments are, therefore, inapposite to the Department's espoused practices, which this court has already appraised as a reasonable interpretation of 19 C.F.R. § 351.511(a)(2)(iv). The court is not compelled to indulge in a drawn out interpretative analysis in order to determine whether the agency had intended to include VAT in its calculations. The court's role is limited to ascertaining whether Commerce reasonably included VAT and import duties in its benchmark calculations. Here, the Federal Circuit has already previously *1276 acknowledged that the inclusion of import charges not actually incurred by the parties in order to calculate a Tier 2 benchmark price is still "consistent with the relevant statute and regulation" because that is the prerogative of a "world market price" calculation. Essar Steel Ltd. v. United States , 678 F.3d 1268, 1274 (Fed. Cir. 2012). The regulation itself "does not explicitly limit adjustments to ... the two [charges] listed;" and because the regulation mandates that Commerce adjust the comparison price to reflect the price that a firm actually paid or would pay if it imported the product, "[t]o interpret the regulation as requiring Commerce to adjust benchmark prices only for delivery charges and import duties would render this mandate meaningless ...." Changzhou Trina Solar Energy Co. , 255 F.Supp.3d at 1325 (emphasis added). Accordingly, Commerce's determination was not a "plainly erroneous or inconsistent" application of 19 C.F.R. § 351.511(a)(2)(iv).
To that end, the Department did not act unreasonably when it included VAT and import duties in its Tier 2 benchmark calculations for synthetic rubber and carbon black. Commerce's decision to add VAT and import duties to the benchmark prices is consistent with the relevant statute and regulation and is supported by substantial evidence.
D. Ocean Freight
In its Final Results , the Department included ocean freight costs in its nylon cord Tier 1 benchmark calculations. I & D Mem. at 10-13. Guizhou argues that Commerce's addition of ocean freight to the nylon cord benchmark was "unsupported by substantial evidence on the record" because Chinese import statistics are "already freight inclusive." Pls.' Br. at 43. Xugong also disputed this inclusion, largely adopting Guizhou's position, and adding that the "GOC argued that record evidence demonstrated that Chinese import statistics are reported on a CIF basis." Xugong Br. at 21.
As the Department acknowledges in its briefing, where Chinese import prices include "cost, insurance, and freight" (CIF) prices, those charges already account for freight charges-including ocean freight. Def.'s Br. at 40. The Government argues that Commerce did "not find evidence on the record that indicated that the Chinese import statistics were reported on a CIF basis." Id. However, the record demonstrates that Guizhou submitted factual information for the calculation of benchmarks used in the less than adequate remuneration programs, which noted specifically and on two separate instances that "imports are valued on a CIF basis and exports on a FOB basis." GTC Second Benchmark Submission, J.A. Tab 19 attach. 4 n. 2.1.1, 2.4.1. It is puzzling how Commerce concluded that there was no evidence indicating that the import prices were CIF inclusive, if Commerce judiciously reviewed the record before it.
Putting aside the substantive issue of whether Chinese import statistics are reported on a CIF basis-therefore rendering the ocean freight costs duplicative in the benchmark calculations-the Department is required by the "substantial evidence" analysis to consider all of the evidence in the record in order to make a reasonable determination on the merits. Indeed, "substantial evidence 'means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,' " which also includes consideration *1277 of "whatever in the record fairly detracts from its weight." CS Wind Viet. Co. v. United States , 832 F.3d 1367, 1373 (Fed. Cir. 2016). Certainly, evidence in the record demonstrating that imports may be valued on a CIF basis would detract from the Department's ultimate decision to include ocean freight costs to the nylon cord benchmark. Based on its explanations, Commerce clearly declined to consider-and made no mention of-this evidence. The court cannot sustain the Department's decision to turn a blind eye on evidence that is entirely pertinent to its ultimate conclusion.
In light of this evidence having been placed on the record and properly raised before the Department, Commerce has unreasonably concluded that there was "no[ ] ... information on the record that indicates these Chinese import statistics are reported on a CIF basis." I & D Mem. at 15. The court orders Commerce to review the record in its totality, including evidence submitted by Guizhou, in order to come to a reasonable conclusion; until then, the Department's decision to include ocean freight is not supported by substantial evidence and must be remanded for further consideration.
IV. The VAT and the Import Duty Exemption for Imported Raw Materials Program
As it explained in its Amended Final Results , the Department concluded that the import duty exemptions and VAT exemptions on imports of raw materials-under the VAT and Import Duty Exemption for Imported Raw Materials Program-were countervailable subsidies. This determination was reasonable and supported by substantial evidence drawn from the record.
Pursuant to 19 C.F.R. § 351.519(a)(1)(ii), "a benefit exists to the extent that the exemption extends to inputs that are not consumed in the production of the exported product." In analyzing whether a program for exemption of import charges upon export results in a countervailable benefit, Commerce must consider whether the government in question "maintains controls adequate to ensure that any remission or exemption of import duties does not extend to duties on inputs not consumed in production for export." GGB Bearing Tech. (Suzhou) Co. v. United States , 41 CIT ----, ----, 279 F.Supp.3d 1233, 1241-42 (2017). Commerce will consider the entire amount of an exemption to confer a benefit unless the government has a specifically delineated procedure "to confirm which inputs are consumed in the production of the exported products and in what amounts, and the system or procedure is reasonable, effective for the purposes intended, and is based on generally accepted commercial practices in the country of export." 19 C.F.R. § 351.519(a)(4)(i). Based on this framework, Commerce determined that the import duty and VAT exemptions were specific and provided a financial contribution sufficient to countervail the import duty aspect of the program.
Plaintiffs argue that GTC has "placed sufficient information on the record to demonstrate either that the system in place was reasonable or that its actual consumption was verified by the GOC," referring to the Processing Trade Goods Handbook and a Customs verification process that allegedly reviews GTC's accounting books and records "including unit consumptions." Pls.' Br. at 34. GTC further contends that at the time of its First Supplemental Response, GTC was "in the process of providing actual consumption *1278 figures to customs," id. at 35, and that Commerce "ignored all information submitted by GTC in making its determination under 19 C.F.R. § 351.519(a)(4) that the GOC did not have an effective system in place to ensure that [the] exempted imported inputs were not used in [the] exported product," id. at 32.
The court does not find merit in Plaintiffs' arguments that Commerce failed to consider all record evidence before concluding that the program provided countervailable benefits. In accordance with 19 C.F.R. § 351.519(a)(4)(i), Commerce examined whether the Government of China had a defined and reasonable procedure to confirm which inputs, and in what amounts, are consumed in the production of the exported products. After its review, Commerce found that the GOC did not have an effective system in place to qualify for a valid exception, based on the fact that the GOC failed to explain "how it determined the quantity of material ... consumed in the production process and to provide sample documentation or reports to support its explanation." I & D Mem. at 19. Indeed, the GOC provided generic responses to Commerce's questions concerning consumed materials in the OTR tires production, and referred generally to Customs Measures and the Processing Trade Goods handbook, while utterly neglecting to provide specific details on how the GOC determined the quantity of rubber, nylon cord, and carbon black consumed in the production process. See GOC Initial Questionnaire Resp. at 59.
Guizhou's argument that Commerce failed to consider GTC's responses-in lieu of the GOC's-when reviewing the record fares no better. First, Commerce is entitled to focus on the GOC's responses in light of the fact that its regulations specifically require that the Department determine that the "government in question has in place and applies" the appropriate procedure confirming which inputs are consumed in the production and in what amounts. 19 C.F.R. § 351.519(a)(4)(i) (emphasis added). Moreover, GTC's responses still fail to show that the Department's determination that the program provided countervailable benefits and failed to meet the exception requirements under § 351.519(a)(4) was either unreasonable or unsupported by substantial evidence. Responding to the Department's question about how the quantity of the material was consumed in the production, GTC similarly described the basic material consumption process but neglected to detail specifically how it initially determined the quantity of rubber, nylon cord, or carbon black consumed in the production of tires by Guizhou. GTC Initial Questionnaire Resp. at 12; GTC First Supp. Resp. at 27.
The Department calls attention to this flaw, evident in both the GOC's and GTC's questionnaire responses, when it concluded that the GOC failed to show that "it applied the process outlined in the Customs Measures and Measures of Unit Consumption," a step necessary to determine the quantity of rubber, nylon cord, and carbon black actually consumed in the production. I & D Mem. at 20 (emphasis supplied). Therefore, the Department concluded, the GOC failed to provide a sufficient basis for non-countervailability under the regulation. Id.
The court agrees. To its credit, GTC does provide a cursory reference to the standard procedure it must undergo in order to verify input consumption to the GOC; however, the analysis and corresponding documentation fall short of demonstrating that the GOC maintains a process *1279 to verify GTC's actual consumption of rubber, nylon cord, or carbon black for the production of tires by Guizhou or other tire producers. GTC Initial Questionnaire Resp. at 12, 16, Exs. II.E.1, II.E.2; GTC First Supp. Resp. at 27. For example, in response to a supplemental questionnaire requesting a "detailed explanation of how the documents provided at Exhibit II.E.1 establish the quantity of imported material consumed in the production process and in the production of exports in particular"-that is, the core of a 19 C.F.R. § 351.519 analysis-Guizhou responded merely that "[t]he quantity and value of imported material listed in Exhibit II.E.1] ]" were GTC estimates, and that the "actual quantity of imported material can be determined based on Exhibit II.E.2."[2] GTC First Supp. Resp. at 27. Devoting little airtime to any semblance of a detailed explanation of the government system in place, Guizhou directs Commerce instead to Exhibit II.E.2, a VAT and Import Tariff Exemptions Table detailing the imported materials during the POR. Though that may be part of the regulatory analysis, the underlying concern is whether the government maintains and applies a consistent procedure in order to confirm the inputs consumed in the production. The results-provided by Guizhou in Exhibit II.E.2-are just business records listing the outputs of the system in question.
All in all, Commerce's review of the record evidence was reasonable and its decision to countervail the VAT and the Import Duty Exemption for Imported Raw Materials Program is supported by substantial evidence that the court will not now disturb.
V. Voluntary Remand of VAT
Although no longer in dispute, Commerce did calculate a 17 percent VAT rate on imports of natural and synthetic rubber. Prelim. Results Calculations 9, J.A. Tab 26 (Oct. 5, 2016) (unchanged in Final Results ). Because the parties are in agreement, the court remands to Commerce for further consideration of this issue.
Without admitting error, as here, Commerce "may request a remand ... in order to reconsider its previous position" by "simply stat[ing] that it ha[s] doubts about the correctness of its decision," and if the agency's concern is substantial and legitimate, a remand is usually appropriate. SKF USA Inc. v. United States , 254 F.3d 1022, 1029 (Fed. Cir. 2001). Commerce's concerns are considered substantial and legitimate when "(1) Commerce has a compelling justification for the remand, (2) the justification for remand is not outweighed by the need for finality, and (3) the scope of the remand is appropriate." Timken Co. v. United States , Slip Op. 14-51, 2014 WL 1760033, at *3 (2014) (citing Ad Hoc Shrimp Trade Action Comm. v. United States , 37 CIT ----, ----, 882 F.Supp.2d 1377, 1381 (2013) ). However, "if the Government's request for a remand 'is frivolous or in bad faith,' the *1280 court may deny the remand." SeAH Steel VINA Corp., v. United States , 40 CIT ----, ----, 182 F.Supp.3d 1316, 1333 (2016) (citing SKF USA Inc. , 254 F.3d at 1029 ).
Plaintiffs argue that the Department should revise its calculations for the VAT and Import Duty Exemption for Imported Raw Materials Program to account for two errors in Commerce's benefit calculation. Pls.' Br. at 36. To that end, the Department requests that the Court grant a voluntary remand regarding the program in order to reconsider the two aspects of the ad valorem rate calculation identified by Guizhou. Def.'s Br. at 45.
The Court finds no evidence of frivolousness in the Department's request for a voluntary remand on this issue. Indeed, there are two limited and compelling grounds for a remand that both Guizhou and Commerce have recognized. First, the Department notes that the VAT export rebate rate should have been reduced by 9 percent-bringing the VAT export rebate rate down to 8 percent instead of the originally identified 17 percent-to account for the rebate of VAT for OTR tires. Id. Second, the Department requests reconsideration of the proper sales denominator used to calculate the ad valorem rate for the program. Id. at 46. Guizhou argues-and Commerce agrees-that the "export sales only denominator" that was used to calculate the ad valorem rate in Commerce's Final Results is in error because Commerce has already previously found that the benefit for this program is used for both export and domestic sales. Pls.' Br. at 38; Def.'s Br. at 45. Commerce acknowledges that it "did not fully address the[se] arguments raised by Guizhou in its brief" and requests a remand, without admitting error, in order to "obviate the need for the Court to rule on an issue that Commerce itself wishes to reconsider." Def.'s Br. at 46. Furthermore, the interest in protecting the administrative proceeding from material inaccuracies is not outweighed by a need for finality because the court has already concluded that several issues are in need of reconsideration by the Department, thereby mooting any concerns over finality. Because Commerce presented undisputed and compelling justifications for remand that are not outweighed by the (now moot) need for finality, Commerce's request for a voluntary remand to reconsider its determinations regarding the VAT program is granted. On remand, Commerce is to review its decision to issue a 17 percent VAT export rebate rate in light of the fact that there is generally a 9 percent rate of VAT for OTR tires; and Commerce may reconsider its calculations when attributing the subsidy benefit only to export sales.
CONCLUSION
The court sustains the Department's decision to countervail the Import Duty Exemption for Imported Raw Materials Program, but grants the Department's request for voluntary remand to reconsider the VAT export rebate rate and the ad valorem rate for the Program. The court also sustains the Department's selection of quarterly benchmark data in its LTAR calculations, and finds that the Department did not act unreasonably when it included VAT and import duties in the benchmark calculations for synthetic rubber and carbon black.
However, the Department's decision to apply AFA regarding China's Export-Import Bank Buyer's Credit Program was unreasonable because material information was not missing from the record. The GOC
*1281 had provided sufficient responses to the Department's questionnaires reflecting non-use of the Program, and the Department's AFA determination to the contrary was not supported by substantial evidence. The court also finds that the Department's decision to include ocean freight costs in its nylon cord Tier 1 benchmark calculations was not supported by substantial evidence because the Department failed to consider evidence demonstrating that Chinese imports are already freight inclusive; on remand, the court orders the Department to consider the evidence submitted by the parties to determine whether ocean freight costs would be duplicative to its benchmark calculations.
For the foregoing reasons, after careful review of all papers, it is hereby
ORDERED that the Department reconsider its decision to apply AFA as to China's Export Import Bank Buyer's Credit Program, taking into account the GOC's evidence of non-use, as in accordance with the Opinion and Order; it is further
ORDERED that the Department consider the evidence submitted by GTC as to the ocean freight costs for the nylon cord benchmarks and apply its analysis to the Department's redetermination as in accordance with the Opinion and Order; and it is further
ORDERED that the Department review on remand its VAT export rebate rate calculation as well as the proper sales denominator used to calculate the ad valorem rate for the VAT and Import Duty Exemption for Imported Raw Materials Program; it is further
ORDERED that all other challenged determinations of Commerce are sustained; and it is further;
ORDERED that Commerce shall have ninety (90) days from the date of this Opinion and Order in which to file its redetermination, which shall comply with all directives in this Opinion and Order; that the Plaintiff shall have thirty (30) days from the filing of the redetermination in which to file comments thereon; and that the Defendant shall have thirty (30) days from the filing of Plaintiff's comments to file comments.

The Department also argues that Guizhou failed to exhaust its administrative remedies with respect to the adverse rate of 10.54 percent applied to the Export Buyer's Credit Program. Def.'s Resp. to Pls.' Mot. for J. on Agency R. 25, ECF No. 71 (May 25, 2018). This argument is also rendered moot by the court's remanding the Department's use of AFA for the Buyer's Credit Program. However, despite failing to specifically rebut the 10.54 percent adverse rate ultimately applied by Commerce, Guizhou implicitly raised objections to the AFA rate when it raised evidence of non-use on the record and disputed the application of an AFA rate generally. GTC Admin. Case Br. 18, J.A. Tab 27 (Dec. 12, 2016).

Moreover, GTC argues that Commerce failed to notify the GOC of a deficiency in its response and that the failure to do so "was contrary to law," given the Department's "statutory obligation to inform parties of deficiencies in their submission[s] to permit them an opportunity to cure those deficiencies." Pls.' Br. at 30. This characterization of the record also misses the mark. Contrary to GTC's contention, Commerce did not find a gap in neither the GTC's nor the GOC's responses. Rather, the Department considered the evidence presented on the record and concluded that the parties failed to demonstrate that the GOC maintained (and applied) a specific procedure to determine the quantity of rubber, nylon cord, or carbon black consumed.