Slip Op. 19-13

# UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| CLEARON CORP. and OCCIDENTAL CHEMICAL CORP., | : | |
| | : | |
| Plaintiffs, | : | |
| | : | Before: Richard K. Eaton, Judge |
| v. | : | |
| | : | Consol. Court No. 17-00171 |
| UNITED STATES, | : | |
| | : | |
| Defendant, | : | |
| | : | |
| and | : | |
| | : | |
| HEZE HUAYI CHEMICAL CO., LTD., | : | |
| | : | |
| Defendant-Intervenor. | : | |

## OPINION and ORDER

[United States Department of Commerce's final results are sustained in part and remanded.]

Dated: January 25, 2019

*James R. Cannon, Jr.*, Cassidy Levy Kent (USA) LLP, of Washington, DC, argued for Plaintiffs. With him on the brief was *Ulrika K. Swanson*.

*Sonia M. Orfield*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for Defendant. With her on the brief were *Chad A. Readler*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Patricia M. McCarthy*, Assistant Director. Of Counsel on the brief was *Catherine Miller*, Attorney, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, DC.

*Gregory S. Menegaz*, deKieffer & Horgan, PLLC, of Washington, DC, argued for Defendant-Intervenor. With him on the brief were *Alexandra H. Salzman*, *J. Kevin Horgan*, and *Judith L. Holdsworth*.

Eaton, Judge: Two motions for judgment on the agency record are before the court in this consolidated action.[1] Each motion challenges the final results in the United States Department of Commerce's ("Commerce" or the "Department") first administrative review of the countervailing duty order on chlorinated isocyanurates[2] from the People's Republic of China. *Chlorinated Isocyanurates From the People's Rep. of China*, 82 Fed. Reg. 27,466 (Dep't Commerce June 15, 2017) and accompanying Dec. Mem. (June 9, 2017), P.R. 117 ("Final DM") (collectively, the "Final Results").

The first motion is that of Defendant-Intervenor (and Consolidated Plaintiff) Heze Huayi Chemical Co., Ltd. ("Heze").[3] Heze disputes Commerce's decision to use adverse facts available to determine that the Export Buyer's Credit Program administered by China's state-owned Export-Import Bank ("China ExIm") was countervailable and that Heze used and benefitted from the program. *See* Heze's Mem. Supp. Mot. J. Agency R., ECF No. 27-1 ("Heze's Br."); *see also* Heze's Resp. Br., ECF No. 33; Heze's Reply Br., ECF No. 34.

---

[1]     On September 28, 2017, *Heze Huayi Chemical Co. v. United States*, Court No. 17-00185 was consolidated under the lead case, Court No. 17-00171. *See* Order dated Sept. 28, 2017, ECF No. 25.

[2]     Chlorinated isocyanurates are "derivatives of cyanuric acid, described as chlorinated s-triazine triones." *Chlorinated Isocyanurates From the People's Rep. of China*, 82 Fed. Reg. 27,466 (Dep't Commerce June 15, 2017) and accompanying Dec. Mem. (June 9, 2017), P.R. 117, at 2.

[3]     Heze, a Chinese producer and exporter of subject merchandise, and a mandatory respondent in the subject review, is the plaintiff in Court No. 17-00185 and the defendant-intervenor in this consolidated action. *See* Order dated Aug. 11, 2017, ECF No. 19.

The second motion was filed by Plaintiffs Clearon Corp. and Occidental Chemical Corp. (collectively, "Clearon").[4] Clearon challenges Commerce's selection of 0.87 percent as the adverse facts available rate for the Export Buyer's Credit Program under the Department's adverse facts available hierarchy method used in reviews. *See* Pls.' Mem. Supp. Mot. J. Admin. R., ECF No. 28-1 ("Clearon's Br."); *see also* Pls.' Resp. Br., ECF No. 31; Pls.' Reply Br., ECF No. 35.

Defendant the United States ("Defendant"), on behalf of Commerce, opposes both motions and urges the court to sustain the Final Results. *See* Def.'s Resp. Pls.' Mots. J. Agency R., ECF No. 32 ("Def.'s Br.").

The court has jurisdiction under 28 U.S.C. § 1581(c) (2012).

Because Commerce's decision to use adverse facts available is neither supported by substantial evidence nor in accordance with law, it is remanded. If, on remand, Commerce continues to determine that Heze used and benefitted from the Export Buyer's Credit Program, and the court sustains that determination, the Department may continue to use the 0.87 percent rate because it is supported by substantial evidence and otherwise is in accordance with law.

**BACKGROUND**

China ExIm administers loan programs to support the export of Chinese goods and services. Two of these programs are the Export Buyer's Credit Program and the Export Seller's Credit Program.

---

[4]    Clearon Corp. and Occidental Chemical Corp. are U.S. producers of subject merchandise and petitioners in the underlying review. They are Plaintiffs in the lead case, Consolidated Court No. 17-00171.

## I.     Export Buyer's Credit Program

In order to promote exports, the Export Buyer's Credit Program provides credit at preferential rates to foreign purchasers of goods exported by Chinese companies. *See* Government of China's Third Suppl. Quest. Resp. (Feb. 8, 2017), P.R. 98, Ex. S3-3 at Art. 2 (Rules Governing Export Buyers' Credit, dated Nov. 20, 2000) (English trans.) (China ExIm extends "mid- to long-term credit loans issued to foreign borrowers used for importers to make payments to Chinese exporters for goods, thereby promoting the export of Chinese goods and technical services."); *see also SolarWorld Americas, Inc. v. United States*, 41 CIT __, __, 229 F. Supp. 3d 1362, 1363 (2017) (noting rates are "preferential" under the Export Buyer's Credit Program).

## II.    Export Seller's Credit Program

The Export Seller's Credit Program provides below-market-rate loans to producers and marketers of Chinese products in order to encourage exports. *See Chlorinated Isocyanurates From the People's Rep. of China*, 79 Fed. Reg. 56,560 (Dep't Commerce Sept. 22, 2014) (final affirmative countervailing duty determination) and accompanying Issues and Dec. Mem. (Sept. 8, 2014), bar code 3227120-01 ("Investigation Final IDM") at 14 (China ExIm extends to sellers of Chinese exports "a loan with a large amount, long maturity, and preferential interest rate."). Like the Export Buyer's Credit Program, the purpose of the Export Seller's Credit Program is "to [provide] support [for] the export of [Chinese] products and improve their competitiveness in the international market." Investigation Final IDM at 14.

**III.     The Countervailing Duty Investigation of Chlorinated Isocyanurates**

The countervailability of the export buyer's and seller's credit programs arose in the original investigation of chlorinated isocyanurates from China, the only prior segment of this proceeding. During the investigation, the Department found that the Export Buyer's Credit Program was not used by the relevant customers of either of the mandatory respondents in the investigation, Hebei Jiheng Chemical Co. Ltd. ("Jiheng") and Juancheng Kangtai Chemical Co. Ltd. This finding was based on declarations of non-use in which the respondents' customers "certified that they did not receive any financing from China ExIm." Investigation Final IDM at 15. Commerce found that it was able to partially verify these statements. Thus, the Department did not countervail the Export Buyer's Credit Program during the original investigation.

As to the Export Seller's Credit Program, however, Commerce determined that the program was countervailable. The record showed that mandatory respondent "Jiheng reported that it had outstanding financing under the export seller's program during the [period of investigation]." Investigation Final IDM at 14. Moreover, the Department observed that, in a separate proceeding, *Citric Acid and Certain Citrate Salts From the People's Republic of China*, it had countervailed the program. *See* Investigation Final IDM at 14 (citing *Citric Acid and Certain Citrate Salts From the People's Rep. of China*, 74 Fed. Reg. 16,836 (Dep't Commerce Apr. 13, 2009)). Thus, in the investigation, Commerce used the subsidy rate calculated in *Citric Acid* for the Export Seller's Credit Program, *i.e.*, 0.87 percent, to calculate the countervailing duty rate for Jiheng, finding no basis in the record not to employ it. *See* Investigation Final IDM at 14-15.

IV.     **The Subject Review**

On January 7, 2016, Commerce, at the request of Clearon and Heze, among others, initiated the first administrative review. *See Initiation of Antidumping of Countervailing Duty Admin. Revs.*, 81 Fed. Reg. 736, 737 (Dep't Commerce Jan. 7, 2016); *see also* Clearon's Req. for Admin. Rev. (Nov. 30, 2015), P.R. 3; Heze's Req. for Admin. Rev. (Nov. 6, 2015), P.R. 1. The period of review was February 4, 2014, through December 31, 2014 ("POR"). Heze and Jiheng were selected as mandatory respondents. *See Chlorinated Isocyanurates From the People's Rep. of China*, 81 Fed. Reg. 89,896 (Dep't Commerce Dec. 13, 2016) (preliminary results) and accompanying Prelim. Dec. Mem. (Dec. 5, 2016), P.R. 80 ("Prelim. Dec. Mem.").

Commerce issued multiple countervailing duty questionnaires to Heze and the Government of China ("GOC"), seeking information about China ExIm's export buyer's and seller's credit programs, including internal China ExIm guidelines that were adopted in 2013, *i.e.*, after the period of investigation (which covered calendar year 2012) and before the POR, in connection with amendments to the Export Buyer's Credit Program.

Heze maintained in its questionnaire responses that it did not benefit, directly or indirectly, from either the Export Buyer's Credit Program or the Export Seller's Credit Program during the POR. Further, it asserted that none of its relevant customers used the Export Buyer's Credit Program during the POR, and filed three customer declarations certifying their non-use of the program. *See* Heze's Sec. III Quest. Resp. (May 16, 2016), C.R. 17-22 at 10-11. Ultimately, Heze would submit a total of forty-four declarations of non-use by its U.S. and non-U.S. customers during the course of the review proceeding. *See* Heze's Third Suppl. Quest. Resp. (Feb. 15, 2017), C.R. 83, Ex. SQ3-1.

For its part, the GOC also stated that Heze had not received buyer's or seller's credit during the POR. *See* GOC's Initial Countervailing Duty Quest. Resp. (May 16, 2016), P.R. 30 at 7. Echoing Heze's claims regarding its customers' non-use of buyer's credits, the GOC stated that "[n]one of the [mandatory] respondent's customers used Export Buyer's Credits."[5] GOC's Third Suppl. Quest. Resp. at 2. In response to the Department's request for the 2013 internal guidelines, the GOC declined to provide them, stating that China ExIm's "2013 guidelines are internal to the bank, non-public, and not available for release." GOC Third Suppl. Quest. Resp., Ex. S3-1 at 3.

Based on the responses of Heze and the GOC, the Department made a preliminary finding that Heze did not use the Export Seller's Credit Program during the POR. *See* Prelim. Dec. Mem. at 16. With respect to the Export Buyer's Credit Program, however, Commerce continued to seek more information from the GOC about the operation of the program, and how it may have changed because of the 2013 amendments, and stated that it would publish its findings on the use of this program in a post-preliminary results memorandum. *See* Prelim. Dec. Mem. at 17. For Commerce, understanding the 2013 amendments was necessary "to fully analyze whether the current program is run in the same manner" as it was in the past. Post-

---

[5]     The GOC described the way it determined that none of the mandatory respondents' customers, including Heze's, used the Export Buyer's Credit Program:

> To make this determination, China Ex-Im (1) obtained a list of all US customers of each respondent, (2) logged into its credit record database that contains users of its Export Buyer's and Seller's Credit Programs, (3) entered the name of each customer on the respondents' lists into the database, (4) ensured that the customer names were entered correctly, (5) reviewed the outcome of the database search in the database, and confirmed that no credit was issued to any company on the list.

GOC's Third Suppl. Quest. Resp. at 2.

Prelim. Results Dec. Mem. (May 31, 2017), P.R. 112 ("Post-Prelim. Mem.") at 4 (stating China ExIm is "the primary entity that possesses the supporting information and documentation that are necessary for the Department to fully understand the operation of the program which is prerequisite to the Department's ability *to verify the accuracy of the respondents' claimed non-use of the Export Buyers Credit program*.") (emphasis added).

Commerce then issued additional supplemental questionnaires in which it first asked the GOC to provide "a list of all partner/correspondent banks involved in disbursement of funds under the Export Buyer's Credit program." Post-Prelim. Mem. at 4. Instead of providing this information, however, the GOC stated that it was "unable to provide the information requested because China Ex-Im [had] determined that none of the respondent companies' customers received Export Buyer's Credits or otherwise used this program during the POR." Post-Prelim. Mem. at 4-5. Thereafter, the Department told the GOC that it was not requesting a list of partner/corresponding banks involved in disbursement of funds under the Export Buyer's Credit Program *to the specific respondent companies*, "but rather [it was] requesting a list of the partner/corresponding banks involved in disbursement of funds under the Export Buyers Credit program *to all companies that participated in this program*." Post-Prelim. Mem. at 5. In response, the GOC again stated that "none of the respondents' U.S. customers used this program," and did not provide the requested list. Post-Prelim. Mem. at 5. At no point, including in the Post-Preliminary Memorandum, did Commerce say why it needed this information or connect its request with respondents, respondents' products, or their customers.

In addition, Commerce asked the GOC for information on "the interest rates established during the POR for [the Export Buyer's Credit Program] for all types of financing provided by

China Ex-Im, all loan terms and all denominations." Post-Prelim. Mem. at 5. The GOC failed to

provide this information, too. According to Commerce:

> Instead of providing the requested information, the GOC stated the question was "Not applicable" because none of the respondents' U.S. customers used this program. We again requested this information from the GOC, clarifying that the Department was not requesting that the GOC provide respondent-specific information, but was requesting information on the interest rates established during the POR for every type of financing that all companies received under this program. Instead of providing the information requested, the GOC again noted no respondents['] U.S. customers used this program.

Post-Prelim. Mem. at 5. As with its initial questions, while Commerce made more specific what

information it sought, it at no point in the proceedings said why it wanted this information or tied

its request to the respondents, their products, or their customers.

Finally, Commerce asked the GOC for "original and translated copies of any laws,

regulations or other governing documents" cited by the GOC in its questionnaire responses that

were pertinent to the elimination, in 2013, of a minimum contract amount of $2 million.

Commerce stated:

> [R]ecord information indicates that for a business contract to be supported by the Export Buyers Credit, the contract amount must be more than two million U.S. dollars. Information on the record indicates that the GOC revised this program in 2013 to eliminate this minimum requirement. We requested that the GOC provide original and translated copies of any laws, regulations or other governing documents cited by the GOC in response to our question on this program.

Post-Prelim. Mem. at 5. In response, the GOC stated that the $2 million threshold requirement

appeared for the first time in the 2000 Rules Governing Export Buyers' Credit, and that China

ExIm "confirmed to the GOC that, although the Export-Import Bank adopted in 2013 certain

internal guidelines, those internal guidelines do not formally repeal or replace the provisions of

[the 2000 rules] . . . which remain in effect." GOC Third Suppl. Quest. Resp., Ex. S3-1 at 3. In

other words, for the GOC, the $2 million requirement was not changed by the 2013 amendments.

Although for Commerce the information on 2013 program revisions (including the internal guidelines) was "necessary for the Department to analyze how the program functions," it at no point said why, or explained how, this information was pertinent to the respondents, their products, or their customers. *See* Post-Prelim. Mem. at 6.

**V.      Commerce's Facts Otherwise Available and Adverse Inference Determinations**

In the Post-Preliminary Memorandum, Commerce found that the GOC withheld information that Commerce requested and significantly impeded the proceeding. This conclusion was based on Commerce's claim that, without the requested information, Heze's claims that its customers did not use the Export Buyer's Credit Program were not verifiable. Therefore, Commerce determined that to fill the gaps in the record the use of facts otherwise available was warranted pursuant to 19 U.S.C. § 1677e(a) (2012).[6] *See* Post-Prelim. Mem. at 6.

Also, Commerce found that the GOC, as the primary possessor of the requested information, did not cooperate to the best of its ability, and, therefore, drew the adverse inference, pursuant to 19 U.S.C. § 1677e(b),[7] that Heze used and benefitted from the Export Buyer's Credit Program, despite its claims of non-use, the certifications of non-use from its

---

[6]      The statute provides that Commerce shall use facts available "[i]f . . . 'necessary information is not available on the record, or . . . an interested party or any other person . . . withholds information that has been requested by [Commerce]" or "significantly impedes a proceeding . . . ." 19 U.S.C. § 1677e(a)(1)-(2)(A), (C).

[7]      Where Commerce determines that the use of facts available is warranted, it must make the requisite additional finding that a party has "failed to cooperate by not acting to the best of its ability to comply with a request for information" before it may use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).

customers, and the GOC's statements that neither Heze nor its customers used the program.[8]

Post-Prelim. Mem. at 6; *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed.

Cir. 2003) (discussing the two-step analysis that applies to the use of facts available and adverse

inferences under 19 U.S.C. § 1677e).

---

[8]        Commerce stated:

[T]he GOC has not provided information that would permit us to make a determination as to whether [the export Buyer's Credit Program] constitutes a financial contribution and whether this program is specific. Because the GOC has not cooperated to the best of its ability in response to the Department's specific information requests, we determine, as [adverse facts available], that this program constitutes a financial contribution and meets the specificity requirements of the [countervailing duty statute].

Specifically, the GOC has not provided information with respect to (1) whether it uses third-party banks to disburse/settle Export Buyer's Credits, (2) the interest rates it used during the POR, and (3) whether the China Ex-Im limits the provision of Export Buyer's Credits to business contracts exceeding USD 2 million. Such information is critical to understanding how Export Buyers Credits flow to/from foreign buyers and the China Ex-Im. The nature of the GOC's responses to the Department's information requests indicates that any further attempts to request this necessary information again from the GOC would be futile. Absent the requested information, the GOC's and the respondents' claims of non-use of this program are not verifiable. Therefore, we preliminarily find that the GOC has not cooperated to the best of its ability and, as [adverse facts available], find that Jiheng and [Heze] used and benefited from this program, despite the claims of non-use and certifications of non-use from the respondent's customers. Although the Department has accepted certifications of non-use from the respondents' customers to determine countervailability in prior reviews, as discussed above, [the Export Buyer's Credit Program] was apparently amended in 2013. To fully analyze whether the current program is run in the same manner, as we've discussed in other proceedings, the Department must review the amendments to the program. Because the GOC has not provided the requisite information regarding the program's amendments, the Department was unable to do so.

Post-Prelim. Mem. at 6 (footnotes omitted).

In the Final Results, Commerce applied facts available to the Export Buyer's Credit Program because the GOC withheld information that the Department insisted it needed to fully analyze the program and verify the accuracy of Heze's claims of non-use, *i.e.*, (1) whether China ExIm uses third-party banks to disburse/settle export buyer's credits; (2) the interest rates the bank used during the POR; and (3) whether the bank limits the provision of export buyer's credits to business contracts exceeding $2 million. *See* Final DM at 6 ("Without this information, we were unable to analyze fully how the Export Buyer's Credits flow to/from foreign buyers and the China Ex-Im . . . .").

Additionally, Commerce continued to apply an adverse inference to the facts available asserting that the GOC possessed the information that the Department requested, and by withholding the information, the GOC failed to act to the best of its ability. *See* Final DM at 6. Therefore, applying adverse facts available, Commerce determined that Heze "used and benefited from [the Export Buyer's Credit] program, despite [its] claims of non-use and certifications of non-use from [its] customers." Final DM at 6. In other words, even though there was record evidence indicating that Heze had not used or benefitted from the Export Buyer's Credit Program, and no record evidence that indicated that it had used or benefitted from the program, Commerce, employing adverse facts available, determined that Heze had used and benefitted from the program. *See* Post-Prelim. Mem. at 6 ("Absent the requested information, the GOC's and the respondents' claims of non-use of this program are not verifiable."); *see also* Final DM at 13 ("Absent the requested information, the GOC's claims that the respondent companies did not use this program are not reliable. Moreover, without a full and complete

understanding of the involvement of third-party banks, the respondent companies' (and their customers') claims are also not reliable.").[9]

To select an adverse facts available rate for the Export Buyer's Credit Program, the Department applied its adverse facts available hierarchy method used in reviews.[10] Final DM

---

[9]         In full text, Commerce stated:

As explained in the Post-Preliminary Results, the Department continues to find that the information on the record does not support finding non-use of the Export Buyer's Credit Program, as the GOC and Heze have argued. In prior proceedings in which we have examined this program, we have found that the China Ex-Im, as the lender, is the primary entity that possesses the supporting information and documentation that are necessary for the Department to fully understand the operation of the program which is prerequisite to the Department's ability to verify the accuracy of the respondents' claimed non-use of the program. As we noted in the Post-Preliminary Results, the GOC has not provided the requested information and documentation necessary for the Department to develop a complete understanding of this program, *i.e.*, the use of third-party banks to disburse/settle Export Buyer's Credits, information on the interest rates China Ex-Im established during the POR, and information on the size of the business contracts for which Export Buyer's Credits are applicable. Such information is critical to understanding how Export Buyer's Credits flow to and from foreign buyers and China Ex-Im. Absent the requested information, the GOC's claims that the respondent companies did not use this program are not reliable. Moreover, without a full and complete understanding of the involvement of third-party banks, the respondent companies' (and their customers') claims are also not reliable. . . .

In this case, we have information on the record regarding the 2013 revisions to the program and the involvement of third-party banks. When we asked the GOC to explain how these revisions affected the operation of the program, especially *vis-a-vis* eligibility for borrowing and approved lending institutions, the GOC was not responsive.

Final DM at 13.

[10]         Commerce has used a hierarchical method to select an adverse facts available rate in past reviews, pursuant to 19 U.S.C. § 1677e(b). *See, e.g.*, *Certain Frozen Warmwater Shrimp From the People's Rep. of China*, 78 Fed. Reg. 50,391 (Dep't Commerce Aug. 19, 2013) and accompanying Issues and Dec. Mem., Cmt. 16 ("[P]ursuant to [19 U.S.C. § 1677e(b)], we have

(footnote continued . . .)

at 5. Commerce has employed a hierarchical method in an effort to satisfy the statute's "same or similar program" injunction. *See* 19 U.S.C. § 1677e(d)(1)(A)(i)-(ii) (Supp. III 2015) (providing that Commerce, when selecting a rate from among adverse facts available in countervailing duty cases, may "use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country," or another proceeding that Commerce finds reasonable); *see also Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, __, Slip Op. 18-166 at 13 (Nov. 30, 2018) ("Commerce has developed a methodology by which to determine the appropriate [adverse facts available] rate in accordance with the governing statute."). Applying this method, Commerce determined that the Export Seller's Credit Program qualified as a "similar program" within a segment of the same proceeding. Accordingly, it selected 0.87 percent—the highest non-*de minimis* rate calculated for a cooperating respondent in the investigation (Jiheng) that was found to have used and benefitted from the Export Seller's Credit Program. *See* Final DM at 14.

When calculating the countervailing duty rate for Heze, Commerce included the subsidy rate of 0.87 percent as a part of its calculation (*i.e.*, as an adverse facts available rate for the Export Buyer's Credit Program). Heze received a net countervailing duty rate of 1.91 percent. *See Chlorinated Isocyanurates From the People's Rep. of China*, 82 Fed. Reg. at 27,467. This litigation followed.

---

applied our [countervailing duty adverse facts available] methodology and assigned a net subsidy rate of 10.54 percent *ad valorem* to the [respondent companies] under [the Export Buyer's Credit] program.").

**LEGAL FRAMEWORK**

Under the countervailing duty statute, if Commerce determines that a foreign government or public entity "is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States," a duty will be imposed in an amount equal to the net countervailable subsidy. 19 U.S.C. § 1671(a) (2012); *see also Delverde, SrL v. United States*, 202 F.3d 1360, 1365 (Fed. Cir. 2000) ("The Tariff Act provides that before Commerce imposes a countervailing duty on merchandise imported into the United States, it must determine that a government is providing, directly or indirectly, a countervailable subsidy with respect *to the manufacture, production, or export of that merchandise*.") (emphasis added). This "remedial measure . . . provides relief to domestic manufacturers by imposing duties upon imports of comparable foreign products that have the benefit of a subsidy from the foreign government." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1368 (Fed. Cir. 2014) (citation omitted). The statute applies equally when the imported merchandise is from a nonmarket economy country. *See* 19 U.S.C. § 1671(f)(1); *see also TMK IPSCO v. United States*, 41 CIT __, __, 222 F. Supp. 3d 1306, 1313 (2017) ("Commerce generally must impose countervailing duties on merchandise from a non-market economy . . . country if Commerce makes the findings necessary to countervail a subsidy more generally under the statute.").

A subsidy is countervailable when (1) a foreign government provides a financial contribution (2) to a specific industry and (3) a recipient within the industry receives a benefit as a result of that contribution. *See* 19 U.S.C. § 1677(5)(B). The statute expands upon each of these three factors. First, "financial contribution" means, in pertinent part, "the direct transfer of funds, such as . . . loans." 19 U.S.C. § 1677(5)(D)(i). Second, to be actionable a subsidy must be

specific within the meaning of paragraph (5A).[11] Third, in the case of government loans, a

"benefit" is conferred "if there is a difference between the amount the recipient of the loan pays

---

[11]        Paragraph § 1677(5A) provides that "[a] subsidy is specific if it is an export subsidy described in subparagraph (B) or an import substitution subsidy described in subparagraph (C), or if it is determined to be specific pursuant to subparagraph (D)." 19 U.S.C. § 1677(5A)(A). These subparagraphs provide:

(B) Export subsidy
An export subsidy is a subsidy that is, in law or in fact, contingent upon export performance, alone or as 1 of 2 or more conditions.

(C) Import substitution subsidy
An import substitution subsidy is a subsidy that is contingent upon the use of domestic goods over imported goods, alone or as 1 of 2 or more conditions.

(D) Domestic subsidy
In determining whether a subsidy (other than a subsidy described in subparagraph (B) or (C)) is a specific subsidy, in law or in fact, to an enterprise or industry within the jurisdiction of the authority providing the subsidy, the following guidelines shall apply:

(i) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, expressly limits access to the subsidy to an enterprise or industry, the subsidy is specific as a matter of law.

(ii) Where the authority providing the subsidy, or the legislation pursuant to which the authority operates, establishes objective criteria or conditions governing the eligibility for, and the amount of, a subsidy, the subsidy is not specific as a matter of law, if—

(I) eligibility is automatic,

(II) the criteria or conditions for eligibility are strictly followed, and

(III) the criteria or conditions are clearly set forth in the relevant statute, regulation, or other official document so as to be capable of verification.

(footnote continued . . .)

on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market." 19 U.S.C. § 1677(5)(E)(ii); 19 C.F.R. § 351.505(a) (2016) (same).

---

> For purposes of this clause, the term "objective criteria or conditions" means criteria or conditions that are neutral and that do not favor one enterprise or industry over another.

(iii) Where there are reasons to believe that a subsidy may be specific as a matter of fact, the subsidy is specific if one or more of the following factors exist:

(I) The actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number.

(II) An enterprise or industry is a predominant user of the subsidy.

(III) An enterprise or industry receives a disproportionately large amount of the subsidy.

(IV) The manner in which the authority providing the subsidy has exercised discretion in the decision to grant the subsidy indicates that an enterprise or industry is favored over others.

> In evaluating the factors set forth in subclauses (I), (II), (III), and (IV), the administering authority shall take into account the extent of diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation.

(iv) Where a subsidy is limited to an enterprise or industry located within a designated geographical region within the jurisdiction of the authority providing the subsidy, the subsidy is specific.

For purposes of this paragraph and paragraph (5B), any reference to an enterprise or industry is a reference to a foreign enterprise or foreign industry and includes a group of such enterprises or industries.

19 U.S.C. § 1677(5A).

To analyze these three factors, "Commerce often requires information from the foreign government allegedly providing the subsidy." *Fine Furniture*, 748 F.3d at 1369-70 (citing *Essar Steel Ltd. v. United States*, 34 CIT 1057, 1070, 721 F. Supp. 2d 1285, 1296-97 (2010), *rev'd on other grounds,* 678 F.3d 1268 (Fed. Cir. 2012)). This is because "normally, [foreign] governments 'are in the best position to provide information regarding the administration of their alleged subsidy programs, including eligible recipients.'" *Id*. at 1370 (quoting *Essar Steel*, 34 CIT at 1070, 721 F. Supp. 2d at 1297). "Additionally, Commerce sometimes requires information from a foreign government to determine whether a particular respondent received a benefit from an alleged subsidy . . . ." *Id*.

Where the Department lacks the information it needs to make a countervailing duty determination, it must use "facts otherwise available." 19 U.S.C. § 1677e(a). If Commerce determines that the use of facts otherwise available is warranted, and makes the additional finding that a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information," it may use an adverse inference "in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b).

A foreign government may be found to be a non-cooperating party. *See Fine Furniture*, 748 F.3d at 1371 ("[O]n its face, the statute authorizes Commerce to apply adverse inferences when an interested party, including foreign government, fails to provide requested information."). Under such circumstances, the application of adverse facts available "may adversely impact a cooperating party, although Commerce should seek to avoid such impact if relevant information exists elsewhere on the record." *Archer Daniels Midland Co. v. United States*, 37 CIT __, __, 917 F. Supp. 2d 1331, 1342 (2013) (citation omitted). When making an adverse inference, Commerce may rely upon information derived from the petition, a final

determination in the investigation, any previous review or determination, or any other information placed on the record. *See* 19 U.S.C. § 1677e(b)(2)(A)-(D).

In determining a rate from adverse facts available in a countervailing duty case, the statute provides that Commerce may:

> (i)  use a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or

> (ii)  if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that [Commerce] considers reasonable to use . . . .

19 U.S.C. § 1677e(d)(1)(A) (Supp. III 2015). Further, Commerce may "apply any of the countervailable subsidy rates . . . specified [in § 1677e(d)(1)], including the highest rate . . ., based on the evaluation by [Commerce] of the situation that resulted in [Commerce] using an adverse inference in selecting among the facts otherwise available." *Id*. § 1677e(d)(2). Where the rate is from a separate segment of the same proceeding, corroboration is not required. *See id*. § 1677e(c)(2) ("[Commerce] . . . shall not be required to corroborate any . . . countervailing duty applied in a separate segment of the same proceeding.").

**DISCUSSION**

This consolidated case presents two main questions: (1) Defendant-Intervenor Heze questions whether the use of adverse facts available by Commerce to determine that Heze used and benefitted from the Export Buyer's Credit Program, despite evidence on the record that neither Heze nor its customers used the program during the POR, is in accordance with law and supported by substantial evidence on the record; and (2) Plaintiffs Clearon question whether Commerce's selection of the Export Seller's Credit Program's 0.87 percent rate as adverse facts available for the Export Buyer's Credit Program is supported by substantial evidence.

I.      **Commerce's Use of Adverse Facts Available Is Neither Supported by Substantial Evidence Nor in Accordance with Law**

In the pertinent decision memoranda, Commerce stated that the use of facts available was warranted because the GOC withheld necessary information, *i.e.*, information "that would permit [Commerce] to make a determination as to whether [the Export Buyer's Credit Program] constitutes a financial contribution and whether this program is specific." Post-Prelim. Mem. at 6; Final DM at 6. For Commerce, this information included (1) whether China ExIm uses third-party banks to disburse/settle export buyer's credits, (2) the interest rates it used during the POR, and (3) whether China ExIm limits the provision of export buyer's credits to business contracts exceeding $2 million.[12] *See* Post-Prelim. Mem. at 6; Final DM at 6. For Commerce, the GOC was "the primary entity that possesses the supporting information and documentation that are necessary for the Department to fully understand the operation of the program" and determine if it was run in the same manner as it was prior to the suspected 2013 amendments. *See* Post-Prelim. Mem. at 4.

According to Commerce, the information it requested would have provided it with a complete understanding of how the Export Buyer's Credit Program operated, which was necessary, in its view, to verify claims that neither Heze nor its customers *used* the program. *See* Final DM at 13 (finding that the requested information was "necessary for the Department to fully understand the operation of the program which is prerequisite to the Department's ability to verify the accuracy of the respondents' claimed non-use of the program."). Moreover, the

---

[12]      The role of third-party banks in the disbursement of credits under the Export Buyer's Credit Program was also the subject of inquiry in the proceedings under review in *Guizhou Tyre Co. v. United States*, 42 CIT __, Slip Op. 18-140 (Oct. 17, 2018) and *Changzhou Trina Solar Energy Co. v. United States*, 42 CIT __, Slip Op. 18-166 (Nov. 30, 2018).

Department found that without the requested information, such claims of non-use were unreliable. *See* Final DM at 13 ("Absent the requested information, the GOC's claims that the respondent companies did not use this program are not reliable," and "without a full and complete understanding of the involvement of third-party banks, the respondent companies' (and their customers') claims are also not reliable."). Beyond this rather broad statement, though, the Department does not tie its inquiries to Heze, its products, or its customers.

In addition, Commerce applied an adverse inference, finding that the GOC failed to act to the best of its ability to provide the information that Commerce asked for about the Export Credit Buyer's Program and its operation. *See* Final DM at 6. Although the record evidence of non-use indicated otherwise, Commerce nevertheless drew the adverse inference that Heze "used and benefitted from this program, despite the claims of non-use and certifications of non-use from [Heze's] customers." Post-Prelim. Mem. at 6; Final DM at 6. Thus, as adverse facts available, Commerce determined that the Export Buyer's Credit Program constituted a financial contribution to Heze and met the specificity requirements of the statute, and that Heze benefitted from the program. *See* Post-Prelim. Mem. at 6; Final DM at 6.

Heze argues that Commerce's decision to use adverse facts available was unreasonable. First, for Heze, resort to facts available was unlawful because the record contained sufficient information for the Department to analyze the operation of the Export Buyer's Credit Program— in particular, statements by the GOC that the 2013 amendments to the program did not repeal or replace the then-existing rules that governed that program. With respect to the internal guidelines of China ExIm that were revised in 2013, Heze acknowledges that the GOC refused to release these guidelines but claims that, since record evidence showed that none of its buyers used the program, the information was unnecessary. *See* Heze's Reply Br. 1-2.

Thus, Heze insists that based on its questionnaire responses, especially the certifications of its customers, "[t]he record evidence overwhelmingly demonstrates that [Heze] did not use or benefit from [the Export Buyer's Credit Program]." Heze's Br. 5. In other words, Heze placed on the record a total of forty-four customer declarations[13] each of which certified the customer "has not financed any purchases from Heze . . . through the use of the Import-Export Bank of China's export buyer's credit program"; and "has never used the Import Export Bank of China's financing (*i.e.*, 'Buyer's Credit program') in any way"—statements that the GOC echoed in its questionnaire responses. *See* Heze's Sec. III Quest. Resp., Ex. 9; Heze's Third Suppl. Quest. Resp., Ex. SQ3-1, SQ3-2; GOC's Third Suppl. Quest. Resp. at 2 ("None of the [mandatory] respondent's customers used Export Buyer's Credits.").

Heze also maintains that the responses provided by the GOC indicate that Heze and its customers "must be aware of whether they used and benefitted from the program." Heze's Br. 5. Specifically, Heze points to the GOC's statements that China ExIm conducts post-loan verification activities that require "consistent and active" engagement by the exporter. *See* Heze's Br. 6 ("It is inconceivable that [Heze] would not be aware that it was a beneficiary of the Ex-Im Bank's Buyer's Credit Program under these circumstances."). In other words, because of the way the program operates in practice, Heze and its customers would have direct knowledge that they used or benefitted from the program.

---

[13]     Heze certified that these were all of its U.S. and non-U.S. customers during the POR. *See* Heze's Sec. III Quest. Resp. at 11.

Further, Heze argues that pursuant to 19 U.S.C. § 1677m(e),[14] "the Department must use the record information necessary to the determination even when it does not meet all of the Department's requirements." Heze's Br. 7 (citing § 1677m(e)(1)-(5)). Accordingly, for Heze, "the record evidence simply does not support the Department's assessment that respondents used or benefitted from the China Ex-Im Export Buyer's Credit Program," and Commerce could have conducted verification to prove it. Heze's Br. 6-7.

The court finds that Commerce's use of adverse facts available is neither supported by substantial evidence nor in accordance with law. Under the plain language of the statute, Commerce must resort to facts available only when "*necessary* information is not available on the record," or an interested party withholds information or significantly impedes a proceeding. 19 U.S.C. § 1677e(a)(1)-(2)(A), (C) (emphasis added). Here, Heze and the GOC provided a good deal of evidence that Heze's U.S. and non-U.S. customers did not use the Export Buyer's Credit Program—evidence that, in accordance with the Department's past practice, was sufficient to demonstrate non-use. Nonetheless, Commerce claims that it was lawful to employ adverse facts available because the GOC failed to provide information in its possession with respect to

---

[14]     This provision of the statute provides that Commerce "shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by [Commerce] or the Commission, if" five conditions are met, *i.e.*, that

> (1) the information is submitted by the deadline established for its submission, (2) the information can be verified, (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination, (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by [Commerce] . . . with respect to the information, and (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e).

"(1) whether it uses third-party banks to disburse/settle Export Buyer's Credits, (2) the interest rates it used during the POR, and (3) whether . . . China ExIm limits the provision of export buyer's credits to business contracts exceeding USD 2 million." Post-Prelim. Mem. at 6. Defendant maintains that the Department could use adverse facts available because "the lack of information impeded Commerce's ability to analyze [the Export Buyer's Credit Program] and verify respondents' claims of non-use." Def.'s Br. 15. The problem with this argument, however, is that Commerce failed to adequately answer the question why—why was the requested information necessary for Commerce to make its determination under these facts?

This Court has looked at similar requests by Commerce on three occasions. In the first case, *Changzhou Trina Solar Energy Co. v. United States*, as here, Commerce sought information as to the respondents' use, directly or indirectly, of the Export Buyer's Credit Program. 40 CIT __, 195 F. Supp. 3d 1334 (2016) ("*Changzhou I*"). When Commerce sought permission to search China ExIm's electronic databases and records itself to verify the claimed non-use of the program during verification in China, the request was denied. *Id.*, 40 CIT at __, 195 F. Supp. 3d at 1354 (internal citation omitted) ("In response to Commerce's query regarding this program, the GOC stated that it had confirmed with PRC Ex–Im and the Respondents that no U.S. customer of any of the Respondents had used the Export Buyer's Credit Program during the [period of investigation]. But when Commerce sought to verify this information, during the verification procedure in China, the GOC refused to permit Commerce to access the PRC Ex–Im's records."). Under those circumstances, the *Changzhou I* Court sustained Commerce's use of adverse facts available in finding that the respondents' purchasers had used the Export Buyer's Credit Program. *Id.* at 1355.

In the case of *Guizhou Tyre Co. v. United States*, Commerce had determined to use adverse facts available after the GOC refused to answer questions concerning third-party banks—questions similar to those asked here that the GOC would not answer. 42 CIT __, Slip Op. 18-140 at 9 (Oct. 17, 2018). The *Guizhou* Court found that the GOC's refusal was "immaterial" based on the evidence of non-use submitted by respondents—evidence similar to the certifications of non-use placed on the record here. The Court stated: "While the Department did note that information as to the functioning of the Program was missing, this finding was rendered immaterial by responses from both Guizhou and the GOC as to the Program's use. This defect proves fatal to Commerce's imposition of [adverse facts available]." *Id*., 42 CIT at __, Slip Op. 18-140 at 7 ("Crucially missing from [Commerce's] assessment is an initial finding . . . that material information was missing from the record."). In other words, Commerce had not adequately explained why it needed the information to verify respondents' questionnaire responses. Therefore, the Court remanded, ordering that "the Department reconsider its decision to apply [adverse facts available] as to China's Export Import Bank Buyer's Credit Program, taking into account the GOC's evidence of non-use." *Id*., 42 CIT at __, Slip Op. 18-140 at 25.

Finally, in the recent case of *Changzhou Trina Solar Energy Co*. *v. United States*, when faced with similar questionnaire responses and the application of adverse facts available, the Court found:

> In this case, Commerce claims its ability to verify the certifications was stymied by a lack of understanding of if and how third party banks were involved in the distribution of loans. Commerce, however, did not explain why the GOC's failure to explain this program was necessary to assess claims of non-use and why other information accessible to respondents was insufficient to fill whatever gap was left by the GOC's refusal to provide internal [China ExIm] bank records. Further, Commerce did not explain how an adverse inference regarding the operation of the [Export Buyer's Credit Program] logically leads to a finding that respondents used the program. The use of facts available allows Commerce to render . . . detailed reasoning for why documentation from the GOC was necessary. Here,

> Commerce provided reasoning as to why the GOC's failure to respond adequately made it impossible for it to understand fully the operation of the [program], but it failed to show *why* a full understanding of the [program's] operation was necessary to verify non-use certifications.

42 CIT __, __, Slip Op. 18-166 at 10 (Nov. 30, 2018) ("*Changzhou II*") (internal citations omitted) (emphasis added).

*Changzhou I* is distinguishable on its facts from this case, and *Guizhou* and *Changzhou II* are instructive as to the correct result here. *Changzhou I* is different because there, (1) Commerce actually went to China to verify the questionnaire responses but was denied access to China ExIm's records, and (2) Commerce provided at least a plausible reason for needing the information it requested. In particular, the Court found reasonable Commerce's explanation as to why the denial of access to China ExIm's records made it impossible to verify whether any of Changzhou's purchasers participated in the program. That is, without an understanding of an exporter's role in its customer's application for a loan under the Export Buyer's Credit Program, conducting a verification of that exporter's books and records would be useless because Commerce would not know what it was looking for, or what might be missing. *See Changzhou I*, 40 CIT at __, 195 F. Supp. 3d at 1355. In *Guizhou* and *Changzhou II*, on the other hand, the record contained evidence of non-use that was similar to the declarations of non-use placed on the record in this case—evidence that Commerce itself had found sufficient in the past. Also, in neither case did Commerce explain why it needed the missing information.

It is important to keep in mind that a determination concerning the presence or absence of a subsidy revolves around whether "the manufacture, production, or export" of particular "merchandise" has been subsidized. 19 U.S.C. § 1671(a)(1). Thus, a determination as to whether the use of facts available or adverse facts available is lawful depends on whether the information missing from the record relates to the "manufacture, production, or export" of that

"merchandise." If it does not, the information is not "necessary" and so the application of neither facts available nor adverse facts available is lawful. *See* 19 U.S.C. § 1677e(a)(1) (authorizing the use of facts available if "necessary information is not available on the record"), (b) (authorizing use of adverse inferences).

Here, in its explanation of its decision to use adverse facts available, Commerce has failed to say how the information it sought relating to: (1) whether China ExIm uses third-party banks to disburse/settle export buyer's credits; (2) the interest rates the bank used during the POR; (3) whether the bank limits the provision of export buyer's credits to business contracts exceeding $2 million; and (4) suspected amendments to the internal procedures for the Export Buyer's Credit Program, is necessary to make a determination of whether the manufacture, production, or export of Heze's merchandise has been subsidized. While Commerce is, no doubt, curious as to all of the inner workings of many Chinese programs, mere curiosity is not enough. Commerce must either provide an adequate answer as to why the information it seeks "to fully understand the operation of the program" is necessary to fill a gap as to Heze's products and their sale, or rely on the information it has on the record.

As to Commerce's claim that it needed the information to verify Heze's questionnaire responses, here, too, the Department has failed to say why. The questions Commerce asked do not seem designed to elicit information that would tend to prove or disprove the record evidence establishing that Heze's purchasers did not use the program. That is, Heze's questionnaire responses and the forty-four declarations of non-use by its U.S. and non-U.S. customers stated that Heze did not directly or indirectly use or benefit from the Export Buyer's Credit Program. Additionally, the GOC's statements support Heze's claims of non-use. As in *Changzhou II*, here "Commerce provided reasoning as to why the GOC's failure to respond adequately made it

impossible for it to understand fully the operation of the [program], but it failed to show why a full understanding of the [program's] operation was necessary to verify non-use certifications." *Changzhou II*, 42 CIT at __, Slip Op. 18-166 at 10.

Therefore, Commerce's use of facts available cannot be sustained because the Department has failed to show that the information it seeks is necessary to its determination. Thus, Commerce, by failing to tie its facts available determination (and therefore its adverse facts available determination) to Heze, its products, or its customers, did not comply with the statute. Nor did Commerce support with substantial evidence its necessary conclusion that there were gaps in the record evidence that could only be filled with the GOC's responses to its questionnaires.

**II.     Commerce's Use of the 0.87 Percent Rate as Adverse Facts Available for the Export Buyer's Credit Program Is Supported by Substantial Evidence**

In the Final Results, Commerce selected the 0.87 percent subsidy rate as the adverse facts available rate for the Export Buyer's Credit Program. *See* Final DM at 14. In making this selection, Commerce applied its judicially-approved adverse facts available hierarchy method used in reviews:

> To select an [adverse facts available] subsidy rate, Commerce first attempts to apply the highest, above *de minimis* subsidy rate calculated for the identical program from any segment of the proceeding. *Absent a calculated above de minimis subsidy rate from an identical program, the Department then seeks a subsidy rate calculated for a similar program.* Absent such a rate, the Department then resorts to the third step in its hierarchy, an above *de minimis* calculated subsidy rate for any program from any [countervailing duty] proceeding involving the country in which the subject merchandise is produced, so long as the producer of the subject merchandise or the industry to which it belongs could have used the program for which the rates were calculated.

*Essar Steel Ltd. v. United States*, 37 CIT __, __, 908 F. Supp. 2d 1306, 1310 (2013), *aff'd* 753 F.3d 1368 (Fed. Cir. 2014) (citations omitted; emphasis added). Applying the second step of this method, Commerce found that the Export Seller's Credit Program qualified as a "similar" program within any segment of the same proceeding, *i.e.*, the investigation segment, and that the highest non-*de minimis* rate calculated for a cooperating respondent for the Export Seller's Credit Program was 0.87 percent.

Clearon does not challenge Commerce's method as inconsistent with the statute. Rather, it questions Commerce's selection of the 0.87 percent rate on substantial evidence grounds. First, noting that Commerce preliminarily selected the rate of 10.54 percent, it argues that, in comparison, the 0.87 percent rate selected in the Final Results is not sufficiently adverse to incent the GOC to cooperate in future proceedings (*i.e.*, to deter non-cooperation). *See* Clearon's Br. 15. For Clearon, "Commerce precedent establishes that the 0.87 percent rate applied here is not a deterrent. In fact, the [GOC] has routinely failed to provide information requested by the Department regarding the Export Buyer's Credit program, *even in cases in which Commerce assigned 10.54 percent as the [adverse facts available] rate*." Clearon's Br. 15. Therefore, Clearon maintains that "the application of a lower rate [than 10.54 percent] will not provide any meaningful incentive to the [GOC] . . . ." Clearon's Br. 15.

Second, Clearon contends that Commerce has failed to explain adequately its conclusion that the Export Seller's Credit Program and the Export Buyer's Credit Program are, in fact, similar. Clearon argues that "[t]he only similarity between these programs . . . is that both programs are export credits. Fundamentally, credits paid to the seller are different from credits paid to buyers, which here not only include direct purchasers but may also include other 'importers' and even lending institutions." Clearon's Br. 18-19. Also, Clearon maintains that

since the GOC failed to provide information about both the Export Seller's Credit Program and the Export Buyer's Credit Program, Commerce had no evidentiary basis to conclude that the two programs were similar. *See* Clearon's Br. 20-21.

If, on remand, Commerce continues to find that Heze used and benefitted from the Export Buyer's Credit Program, and the court sustains that determination, the Department may continue to use the 0.87 percent rate. Notwithstanding Clearon's arguments against the 0.87 percent rate, Commerce's selection of this rate is supported by substantial evidence, for the following reasons.

First, Clearon has not shown that the 0.87 percent rate here is unreasonably low to deter future non-cooperation. Clearon cites this Court's decision in *RZBC Group Shareholding Co. v. United States*, upholding 10.54 percent as the adverse facts available rate for the Export Buyer's Credit Program. 41 CIT __, __, 222 F. Supp. 3d 1196 (2017). There, the Court sustained Commerce's corroboration of the 10.54 percent rate, which was based on secondary information, *i.e.*, the rate that Commerce had assigned to a comparable lending program in a separate proceeding: *Coated Paper From the People's Republic of China*.[15] Whether or not a rate was corroborated, however, has little to do with its deterrent effect. Moreover, whether a rate is sufficient to encourage cooperation in the future is based on Commerce's consideration of the facts. For example, even if the 0.87 percent rate might appear low in comparison to the 10.54

---

[15]     By corroborating the 10.54 percent rate from *Coated Paper*, Commerce complied with the requirement in subsection 1677e(c) that Commerce corroborate "secondary information" that it relies on to arrive at the rate, *i.e.*, information that was not obtained during the course of the review. *See* 19 U.S.C. § 1677e(c)(1). It is worth noting that the Commerce decision under review in *RZBC* predated the Trade Preferences Extension Act of 2015, which created an exception to the corroboration requirement where a countervailing duty is applied in a separate segment of the same proceeding. *See* 19 U.S.C. § 1677e(c)(2) ("[Commerce] . . . shall not be required to corroborate any . . . countervailing duty applied in a separate segment of the same proceeding.").

percent rate, its inclusion in the calculation of Heze's rate increased its rate by approximately

100 percent to 1.91 percent.

Moreover, the record supports Commerce's finding that the Export Buyer's Credit

Program and the Export Seller's Credit Program are "similar," for purposes of its adverse facts

available hierarchy method. While not of ideal clarity, Commerce's reasoning is discernable

from the Final DM:

> Regarding the rate to be applied to [the Export Buyer's Credit Program], upon
> consideration of post-preliminary comments, we agree with the GOC and Heze
> that the rate for the Export Seller's Credit Program from the investigation
> qualifies as a similar program within any segment of the same proceeding
> according to step two of the [adverse facts available] hierarchy for reviews. On
> this basis, we have adjusted the [adverse facts available] rate to 0.87 percent *ad
> valorem*, the rate calculated for Jiheng for the Export Seller's Credit Program in
> the investigation, for these final results.

Final DM at 14. Among the arguments in the post-preliminary comments was that the Export

Seller's Credit Program "is the counterpart of the Export Buyer's Credit program," in that

"[b]oth are administered by the China Ex-Im Bank with the same goal of supporting the export

of Chinese products and improving their competitiveness in international markets, and the

Department analyzes the loans together." Heze's Comments on Post-Prelim. Results (June 2,

2017), P.R. 114 at 10-11 (citing Final DM at 14, Heading 3 titled "Export Seller's and Buyer's

Credits from Export-Import Bank of China."); *see also SolarWorld Americas, Inc. v. United

States*, 40 CIT __, __, 182 F. Supp. 3d 1372, 1377-78 n.8 (finding "Commerce's logic in

considering the programs similar [was] reasonably discernible because both loan programs

perform similar functions in support of Chinese industry by offering lower interest rates on loans

than would otherwise be available to these companies."). It is worth noting that while Clearon

maintains that the credits paid to export sellers are "different" than credits paid to export buyers,

it does not put forth any evidence showing that the programs are entirely dissimilar. Nor does it

argue that the programs have aims other than supporting the export of Chinese goods and services or that subsidies of similar amounts could be deemed to achieve each program's goals. Rather, Clearon contends that "[t]he only similarity" between the Export Seller's Credit Program and the Export Buyer's Credit Program "is that both programs are export credits." Clearon's Br. 18. Even if that were the case, on this record, it was not unreasonable for Commerce to conclude that this similarity was enough to justify finding that the two programs were similar for purposes of applying its adverse facts available rate selection method.

## CONCLUSION and ORDER

Based on the foregoing, it is hereby

**ORDERED** that the Final Results are sustained in part and remanded; it is further

**ORDERED** that, on remand, Commerce issue a redetermination that complies in all respects with this Opinion and Order, is based on determinations that are supported by substantial record evidence, and is in all respects in accordance with law; it is further

**ORDERED** that, on remand, Commerce shall explain how the information it sought as to (1) whether China ExIm uses third-party banks to disburse/settle export buyer's credits; (2) the interest rates the bank used during the POR; (3) whether the bank limits the provision of export buyer's credits to business contracts exceeding $2 million; and (4) suspected amendments to the internal procedures for the Export Buyer's Credit Program, is necessary to make a determination of whether the "manufacture, production, or export" of Heze's merchandise has been subsidized, pursuant to 19 U.S.C. § 1671(a). In doing so, Commerce shall tie its inquiries to Heze, its products, and/or its customers; it is further

**ORDERED** that Commerce must either provide an adequate answer relating to why the information it seeks "to fully understand the operation of the program" fills a gap as to Heze's products and their sale, or rely on the information it has on the record; it is further

**ORDERED** that Commerce comply with the statute by tying its facts available and adverse facts available determinations to Heze, its products, or its customers; it is further

**ORDERED** that Commerce support with substantial evidence its necessary conclusion that there were gaps in the record evidence that could only be filled with the GOC's responses to its questionnaires; and it is further

**ORDERED** that the remand results shall be due ninety (90) days following the date of this Opinion and Order; any comments to the remand results shall be due thirty (30) days following the filing of the remand results; and any responses to those comments shall be filed fifteen (15) days following the filing of the comments.

/s/ Richard K. Eaton
Richard K. Eaton, Judge

Dated:  January 25, 2019
        New York, New York